**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

**THANH THACH,**

       **Plaintiff,**

**v.**                                   **Civil Action No. 3:14-cv-0070 (HEH)**

**EQUIFAX INFORMATION SERVICES,**
**LLC,** *et al.*,

       **Defendants.**


**PLAINTIFF'S OPPOSITION TO DEFENDANT EQUIFAX INFORMATION**
**SERVICES, LLC'S MOTION FOR SUMMARY JUDGMENT**

COMES NOW, the Plaintiff, THANH THACH ("Ms. Thach"), by counsel, and in opposition to the Motion for Summary Judgment filed by Defendant Equifax Information Services, LLC ("Equifax"), she states as follows:

## I. INTRODUCTION

In a case where the Plaintiff made three disputes over a 10 month period, after which at least 6 highly derogatory and inaccurate items remained in her credit file and were published to at least 7 different third parties, Equifax nevertheless summons the temerity to ask this Court to find that there is no genuine issue of material fact, and that Equifax is entitled to judgment as a matter of law.  Indeed - the evidence strongly supports a finding that Equifax's procedures were unreasonable and imprudent to assure maximum possible accuracy.  Nevertheless, to prevail on Defendant's motion, Ms. Thach must only show that there is a question of fact as to such reasonableness. As the Fourth Circuit found in *Dalton v. Capital Associated Indus., Inc.*,"This case is easily grouped within the 'overwhelming majority of cases'" in which "[t]he issue of whether the agency failed to follow 'reasonable procedures' will be a 'jury question.'" 257 F.3d at 416. The troubling facts of this case are a prime example of a situation in which Plaintiff should be permitted to present her story to a jury and receive their verdict.

## II.   PLAINTIFF'S STATEMENT OF FACTS

Defendant's statement of facts combines some "facts" that are plainly untrue and others that are grossly incomplete.   Plaintiff addresses these below pursuant to Local Rule 56. Plaintiff's additional material facts follow.

### A. Plaintiff's Response to Equifax's Statement of Facts.

Generally, nearly all of Equifax's proffered "facts" are derived from the Declaration of its professional witness, Vicki Banks ("Ms. Banks"). Other facts are partially supported by

documents Equifax (and Banks) claim to reflect the history of the Plaintiff's credit file or the responses and reporting of third party credit furnishers. Plaintiff has filed her *Motion to Strike* this evidence and herein objects to same as inadmissible hearsay, not based on personal knowledge and patently contradicted by Equifax's Rule 30(b)(6) testimony. Plaintiff adopts her Motion in Strike as if stated in full herein.  (Dkt No. 128.)   The following facts asserted by Equifax are disputed:

12. Equifax's assertion that it "maintains reasonable procedures" is a legal conclusion, and a wrong one at that.  *See* Part C of Plaintiff's Factual Background and *Infra in passim*.

13, 14-16. Plaintiff disputes that Equifax only accepts credit information from sources it knows to be reliable. There is no admissible evidence in the record to support this statement. Equifax has not produced any of its subscriber agreements in discovery. Ms. Banks was asked whether she had "any specific knowledge about Equifax's relationship with any particular subscriber" in plaintiff's file. (Banks Dep. 29:23-25; 30:1-5, attached hereto as Exhibit 1). In response, Ms. Banks confirmed that she only had general knowledge about subscriber agreements and no knowledge with respect to the particular furnishers in this case. *Id.*  Equifax's evidentiary support is inadmissible for the reasons stated in Plaintiff's contemporaneously filed *Motion to Strike* (Dkt. No. 128).

19. Equifax's procedures are designed to keep costs as low as possible while creating the appearance of an investigation. *See, e.g.,* Banks Dep.  at 40:1-2; 62:18-23; 70:16-23; *see also* Pl.'s Rule 26(a)(2) Expert Report by Evan Hendricks at 4-5, which as attached as Exhibit 2.

21., 24. & 26. ██████████████████████████████████████████
████████████████████████████████████████████████ *Id*. at
40:7-25; 45:19-24; 62:18-23; 70:16-23; 83:22-25; 112:9-15. Equifax has not produced any

admissible evidence of what was actually done regarding the Plaintiff, or at all during the same

period, when ███████████████████████████████████████ *Id.* at 44:10-16, 45:4-11.

Indeed, its professional (and only relevant) witness, Ms. Banks, testified that she did not have

any personal knowledge as to what was reviewed by the ████████████████████████

███████████████████████████ *Id.* at 124:25; 125:1-6. Equifax's evidentiary support is

inadmissible for the reasons stated in Plaintiff's *Motion to Strike* (Dkt. No. 128).

22. Plaintiff disputes that Equifax is able to update and make changes immediately.

████████████████████████████ *Id.* at 40:7-25; 45:19-24; 62:18-23; 70:16-23; 83:22-25;

112:9-15. Moreover, Equifax's statement is misleading to the extent it encompasses substantive

changes, which Ms. Banks confirmed must be done by the furnisher. Banks Dep. 38:23-25, 39:1-

15, 97:19-25, 98:1-6, 98:21-25, 99:1-3.

23. Plaintiff disputes that Equifax notifies the source of the information. ████████████

███████████████████████████████████████████████████████████ *Id.* at

62:18-23; 70:16-23. Additionally, Plaintiff also disputes that Equifax "describes all relevant

information" to the furnisher as explained in Plaintiff's response to Paragraphs 13, 14-16.

25.  This calls for a legal conclusion, contradicts the duty imposed on Equifax by the

FCRA and ignores the fact that each furnisher actually told Equifax that its full data did not

match the Plaintiff's identity. Further, Equifax never even sent the Plaintiff's substantive

disputes to a single furnisher. (Ex. 1, Banks Dep. at 108:18-25).

27. While the ACDV format does provide a *one-line* narrative field—commonly referred

to as the "FCRA relevant information field"—Ms. Banks confirmed this narrative field was not

used in this case. *Id.* at 136:20-25; 137:1-2.[1] Thus, at best, Paragraph 27 is misleading.

---

[1]  Q: From the various ACDVs – and we'll go through them. But I don't have any in which any person at Serco put any character or text into the FCRA relevant information [field]. Are you aware of any instance in which that was done?

28.   There is no evidentiary support for this self-serving claim. Further, by using this automated process, Equifax ignored the many logical inconsistencies reported to it by each data furnisher, including *via* its ACDVs. (*See* Equifax's Memo. Supp. Mot. SJ at 9). Only a partial match of identifiers existed: 3 reported a different name; 8 reported a different address. *Id*. Most reported a combination of these obvious differences. *Id*.

29. Plaintiff disputes Equifax's assertion that its furnishers are required to conduct an investigation pursuant to their contract with Equifax.  No such contracts have been produced, described or detailed.  Equifax supports this statement with only the declaration of Ms. Banks, who testified that she did not have personal knowledge regarding the subscriber agreements and vetting process as its relates to the data furnisher *in this case*. Equifax's evidentiary support is inadmissible for the reasons stated in Plaintiff's contemporaneously filed *Motion to Strike* (Dkt. No. 128). *See also* Hendricks Expert Report at 4-5, 18.

30.   ███████████████████████████████████████████
███████████████████████████████████████ (Ex. 1, Banks Dep. 38:23-25, 39:1-15, 97:19-25, 98:1-6, 98:21-25, 99:1-3; *see also* Ex.2, Hendricks Expert Report at 5 ("Defendant CRAs typically rely entirely on the responses of furnishers (creditors), who through their "instructions" effectively dictate to the Defendant CRAs what will be the outcome of Defendant's reinvestigations. This is true even though furnishers, like the ones in this case, at most, typically only glance at the records system from which they furnished the inaccurate information in the first place. . .  For example, after Plaintiff's January 2013 dispute letter, in which she specifically told Defendants she was being mixed with her mother, Equifax still told the Plaintiff it falsely had verified some six accounts because it was parroting the dictate of this

---

(continued…)

A: I don't not see any no.

furnishers. Equifax did this even though other furnishers instructed Equifax to delete disputed accounts. Thus, Equifax's allegiance to parroting determined the results.")).

31.  As reflected in this case, Equifax did not respond to Plaintiff's September 4, 2012 dispute letter. (*See also* Pl.'s Answers to Equifax's First Set of Interrogatories, Int. No. 5, attached as Exhibit 3).

33-34.  Equifax's characterization of Plaintiff's dispute letter is incomplete. (*See* Pl.'s Mem. Supp. PSJ, Ex. D).

35.  Plaintiff disputes that Equifax's agents were required to review and consider the relevant information provided by Plaintiff. This is the same assertion made by Equifax in Paragraph 21 and Plaintiff refers the Court to her response above. Plaintiff further disputes that the Verizon Virginia account was not reporting in her file. The Verizon Virginia account was reporting on the credit reports obtained by Plaintiff's lenders and the consumer disclosure obtained by Plaintiff from Equifax. (See Ex. 4, at Pl.'s Ex. #000008, Ex. 5, at Pl.'s Ex. #001771; Ex. 6, at Pl.'s Ex. #000042). Thus, this assertion is simply false.

36.  Plaintiff disagrees with Equifax's characterization that it "reinvestigated" 20 of the 21 accounts. Equifax's response to Plaintiff's dispute cannot possibly be characterized as an investigation. (*See, e.g.*, Banks Dep. 38:23-25, 39:1-15, 97:19-25, 98:1-6, 98:21-25, 99:1-3; *See also* Hendricks Expert Report at 5). ███████████████████████████████

███████████████ *Id.* at 62:18-23; 70:16-23; 83:22-25; *see also Motion to Strike* (Dkt. No. 128).

38.  Equifax's chart it uses in its Memorandum in Support of its Motion for Summary Judgment omits any reference to these accounts or the identifying information attributed by the furnishers to these accounts. Plaintiff more truthfully addresses the full set of inaccurate accounts below. Equifax's evidentiary support is inadmissible for the reasons stated in Plaintiff's

contemporaneously filed *Motion to Strike* (Dkt. No. 128).

39. Plaintiff disputes that Equifax added a "Do Not Combine" code to Plaintiff's credit file after her September 4, 2012 dispute letter. Plaintiff's credit file already had a "Do Not Combine" code in October 2009 before it permitted the 22 accounts it later admitted were not accurately attributed to the Plaintiff. (*See* Ex. 7, at EIS-Thach-000141).

40. Plaintiff never received any correspondence from Equifax after her September 4, 2012 dispute. (*See* Ex. 3, Int. No. 5). Notably, Equifax mentions in Paragraph 43 when it mailed Plaintiff its investigation results in response to her second dispute. (*See* Equifax's Memo. Supp. Mot. SJ at 10). Tellingly, Equifax did not provide a date on which it responded to Plaintiff's letter because nothing was mailed to her by Equifax. *Id*. at 9.

43. and 46. ███████████████████████████████████████████████

███████████████████████████████████████████ (*See, e.g.*, Ex. 1, Banks Dep. 38:23-25, 39:1-15, 97:19-25, 98:1-6, 98:21-25, 99:1-3; *see also* Ex. 5., Hendricks Expert Report at 5).

47. Plaintiff disputes that Equifax would have removed this information if she would have disputed.   Equifax's evidentiary support is inadmissible for the reasons stated in Plaintiff's contemporaneously filed *Motion to Strike* (Dkt. No. 128).

50. Plaintiff notes that this Paragraph is misleading to the extent it claims that "[m]any of these checks were drawn from the account of an individual named Cuong D. Dao…." All payments on the account were from Mr. Dao. (*See* Pl.'s Memo. Supp. Mot. SJ, Ex. H).

## (PLAINTIFF'S ADDITIONAL FACTS)

**B.     Equifax had actual notice of likely credit inaccuracy as early as 2009.**

1. In October 2009, Equifax was on actual notice of potential fraud and/or unauthorized use

of Ms. Thach's credit file.  It received a demand to place a "Fraud Alert" in Ms. Thach's file and itself noted in the file and Ms. Thach's credit reports  (Attached as Exhibit 7 is the October 26, 2009 ACIS case, at EIS-Thach-000141) (stating "FRAUD VICTIM… 10/26/2009, FRAUD VICTIM"). Equifax's own documents show that it was forced to use a "Do Not Combine" code on Plaintiff's file as of October 2009 in order to stop a consumer's file from merging with the file of another consumer. *Id*. at EIS-Thach-000141. Before October 2009, after these efforts and actions were required, Equifax only had one name variation reported for Ms. Thach.  *Id*.

2.  Equifax's internal documents also showed that as of October 2009, Equifax determined that an address it had combined or added to Ms. Thach's file and that was later used by Equifax to "match" accounts to Plaintiff's file, 7407 Barley Walk, Falls Church, VA 22042, could not be verified. *Id*. at EIS-Thach-000048 ("Maintenance Sheet Summary… Comments – DON'T SEND REVISED FILE. CURRENT ADDRESS HAS NOT BEEN VERIFIED").

3.  Equifax's internal records show that as of October 2009, it had somehow added "Chia T. Thach" as a former name of Plaintiff, even though Plaintiff never used this name and it was actually the name of her mother. *Id*. at EIS-Thach-000141; (*See also* Ex. 3, Int. No. 1).

**C.  Ms. Thach Tries to Obtain a Mortgage.**

4.  Ms. Thach is a single mother of two children, ages 11 and 12.  In August 2012 and actually for the past seven years through today, Ms. Thach lives in her mother's apartment at ███████████, Falls Church, Virginia, 22042. (Ex. 3, Int. No. 1).  Ms. Thach wanted to obtain a mortgage loan so that she could buy a house for herself and her family because they currently reside with Ms. Thach's mother. *Id*. at Int. No. 6.

5.  When she applied for the loan, Plaintiff had already identified the house she wanted to purchase, which was priced at $164,000. (Thach Dep. 51:15-19, Sept. 2, 2014)

8

(attached to Exp.'s Mem. Supp. PSJ, Ex. B).  Plaintiff had diligently saved her money over the years; therefore, was able to make a substantial down payment in the amount of around $60,000. *Id*. at 51:18-19. Thus, Plaintiff only applied for a loan in the amount of $100,000, which was a modest loan based on her income of roughly $60,000-$70,000 per year as a hair stylist in Washington, D.C. *Id*.; *see also* Ex. 3, Int. No. 2.

6.      Plaintiff attempted to obtain a mortgage loan from several companies, including C&F Mortgage Corporation and McLean Mortgage Corporation. (*See* Pl.'s Mem. Supp. PSJ, Ex. B, Thach Decl.  ¶ 9).  Plaintiff was referred to C&F Mortgage by her friend, Hai Ho ("Mr. Ho"), who had a friend that worked at C&F Mortgage. (Thach Dep. 53:1-11).   When Ms. Thach contacted C&F Mortgage, the broker requested her financial information, which she provided over the phone. *Id*. at 56:8-12.   C&F Mortgage also requested Ms. Thach's permission to pull her credit report. *Id*. at 55:24-25, 56:2-4. After C&F Mortgage obtained her credit report, she was told that she would not qualify for a loan because her credit report contained more than a dozen derogatory credit accounts. *Id*. at 53:8-17, 56-16:18.

7.      This information was inaccurate as Ms. Thach had always paid her bills on time and never had more than seven credit accounts – all of which were in good standing. (Pl.'s Mem. Supp. PSJ, Ex. B, Thach Decl.  ¶¶ 6-8).

8.      Believing that this was a mistake, Plaintiff then applied with McLean Mortgage Corporation, but was told by Joe Lucas that she would never qualify for a loan based on the derogatory credit information in her credit file. (Thach Dep. 57:14-21).   None of the derogatory accounts in these reports actually belonged to the Plaintiff. (Pl.'s Mem. Supp. PSJ, Ex. B, Thach Decl.  ¶¶ 11, 13-14).

9.      Equifax's internal records show that it provided Plaintiff's credit report to First

American Credco ("Credco") on August 20, 2012, and Old Republic on August 13, 2012, companies that resold a tri-merge credit report containing Equifax credit report regarding Ms. Thach. (Ex. 4, at #000043). The Credco and Old Republic credit reports accurately transcribed the account information Equifax had reported. (Exs. 5 & 6)

10.     Not only were the accounts inaccurate, but they also contained obvious inconsistencies in identifying information that alerted Equifax that there was inaccurate information within her credit file. *Id*. at ¶ 11.  The Plaintiff, Thach Cham Thi Thach, has never used any other first name besides Thach, middle name besides Cham Thi, or last name besides Thach. (Ex. 3, Int. No. 2).

11.     In the Equifax report it furnished to the mortgage companies through its customer Credco, Equifax reported all of the following names as belonging to the same person – the Plaintiff: Pat T. Kaia, Chai Thach, Phamh Thach, Phanh Cham Thach, and Thanh Pat Thach. (Ex. 6). Similarly, in the Credit Plus Report obtained by C&F Mortgage, Equifax indicated the Plaintiff was also known by the following names: Chia T. Thach, Thanh Pat Thach, Chai Thach, Phamh Thach and Pat T. Kaia. (Ex. 5).

12.     Similarly, in both Equifax reports obtained by Plaintiff's potential mortgage lenders, two of the three addresses provided by Equifax were incorrect. Plaintiff had never resided or received mail at either of those addresses. (Pl.'s Mem. Supp. PSJ, Ex. B, Thach Decl. ¶¶ 20-23). In the Credco Report, there were at least twenty-two items—many of which were reporting negatively— in the Credco Report that did not belong to Plaintiff. (Ex. 6); (Pl.'s Mem. Supp. PSJ, Ex. B, Thach Decl. ¶ 11).

13.     Moreover, documents produced by Equifax and the data furnishers in this case show that the *verified* accounts that are subject to this action were reported by the respective

furnishers with information that was patently inconsistent with that already in the Plaintiff's Equifax credit file. (*See* Equifax's Memo. Supp. Mot. SJ at 9). For example, four of the creditors were reporting Plaintiff's current address as "3181 Monticello Boulevard," which was different than her address of 6269 Monticello. *Id*. Moreover, four other creditors were reporting a current address of "7407 Barley Walk". *Id*. Thus, Equifax should have been alerted by multiple creditors reporting three different current addresses for Ms. Thach.

14.     Further, Equifax's internal records reveal that its computer had already been forced to mark 8 accounts as "mixed" into Plaintiff's credit file.  (Pl.'s Mem. Supp. PSJ, Ex. F, at EIS-Thach-000004-000007).

15.     Equifax's statement of material facts also omits any reference to the unrefuted expert report of Evan Hendricks ("Mr. Hendricks") in this case.  Mr. Hendricks is one of the leading experts in the United States on credit reporting issues and has testified as an expert witness in at least 25 FCRA cases, including trials before this Court. (Hendricks Expert Report, July 28, 2014, at 32); *Robinson v. Equifax Info. Servs., LLC*, Case No. 1:05-cv-1272 (E.D. Va. 2005); *Sloane v. Equifax Info. Servs., LLC*, Case No. 1:06-cv-2044 (E.D. Va. 2006).

16.     In his report, Mr. Hendricks opines, "Plaintiff's case had several telltale signs of mixed and/or multiple files." (Ex. 2, at 1).  Mr. Hendricks further opined that the "evidence thus far leads [] to the conclusion that Defendant CRAs mixed Plaintiff's mother's data into Plaintiff's file because there was 'a partial SSN match,' a 'partial name match," and an address match." *Id*. at 2. Mr. Hendricks further explained that Equifax's partial matching approach is aimed at keeping their creditor customers happy and ensuring that all information that might possibly relate to a consumer is included in a credit report. *Id*. at 9.

**D.     Plaintiff Disputes the Inaccurate Information in Her Credit File.**

17.     Because of the urgency to obtain her first home, Plaintiff mailed her first dispute letter on September 4, 2012, just days after she obtained copies of her credit reports in late August. (*See* Pl.'s Mem. Supp. PSJ, Ex. D). In her letter, Plaintiff explained that Equifax was reporting more than a dozen accounts in her credit file that did not belong to her. *Id*.

18.     In particular, Plaintiff wrote "I do not owe these debts. I was not aware that these accounts were reporting on my credit report until I applied for a mortgage. I did not open the above accounts, nor did I authorize another person to open them on my behalf. Based on the personal information in my report, it is possible you have confused me with another person with a similar name and/or identifying information." *Id*.

19.     Plaintiff further provided a handwriting exemplar and asked Equifax to forward the handwriting exemplar to the creditors so that they could verify that the signatures on any applications did not belong to her. She also asked Equifax to request from the creditors "a copy of the application or any other supporting documents to prove that [she] owe[d] these debts." *Id*.

20.     Plaintiff also provided her telephone number and requested Equifax to call her if they needed any additional information that it may find helpful to resolve the dispute. *Id*.

21.     Plaintiff's letter was signed under oath and notarized. *Id*.

22.     Plaintiff did not receive any response to her September 4, 2012 dispute letter. Plaintiff mailed another letter to Equifax in January 2013. (*See* Def.'s Mem. Supp. PSJ, Ex. B).

23.     Equifax responded to Plaintiff's dispute with Investigation Results dated February 15, 2013, which indicated that Equifax "verified" that six disputed accounts belonged to Ms. Thach and would remain on her credit report. (*See* Pl.'s Mem. Supp. PSJ, Ex. E). Equifax's verification was inaccurate, as Plaintiff had never opened the two accounts reported by First Premier or the accounts with Bryant State, Comenity, Capital One, and Credit One. (*See* Pl.'s

Mem. Supp. PSJ, Ex. B, Thach Decl. ¶¶ 6-8, 13-14, 16). Plaintiff mailed another letter to Equifax in June 2013. (*See* Def.'s Mem. Supp. PSJ, Ex. C). Equifax responded to Plaintiff's dispute with Investigation Results dated June 21, 2013, which indicated that Equifax "verified" that six disputed accounts belonged to Ms. Thach and would remain on her credit report. (Banks Decl. ¶ 45).

> **E. Equifax Does Not Conduct A Meaningful Investigation Into Plaintiff's Disputes and Simply Parrots the Information It Receives from Its Furnishers.**

24.     The documents and testimony from Equifax in this lawsuit confirm that Equifax did nothing to substantively investigate Plaintiff's dispute. (Ex. 1, Banks Dep. at 112:9-15).



*Id*. at 40:7-25; 45:19-24; 62:18-23; 70:16-23; 83:22-25; 112:9-15.

25.

*Id*. at 40:1-17.

*Id*. at 40:1-2; 62:18-23; 70:16-23; 83:22-25.

*Id*. at 62:18-23.

. *Id*.

26.     An actual investigation is never performed when a consumer mails Equifax a dispute.

. *Id*. at 124:25, 125:1-6, 134:15-20, 135:5-16.



███████████████████████████ *Id.* at 62:18-23; 66:8-25; *see also* Ex. 2, Hendricks Expert Report at 4.

27.  ████████████████████████████████████████

██████████████████████████████████████. *Id.* at 112:9-15. █

████████████████████████████████████████████

████████████████████████████████████ *Id.* at 113:2-10.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████ *Id.* at 112: 16-20, 113:11-17; *see also* Hendricks Expert Report at 5 ("because the ACDV-Exchange is centrals to [Equifax's] operations, they very likely did not consider taking other reasonable investigate steps that have been more effective for dealing with Plaintiff's mixed file-related disputes. For example, in her disputes, Plaintiff provided her contact information to Defendants. But Defendants did not the contact information to resolve the problem effectively.")

28.  ████████████████████████████████████████

███████ Banks Dep. at 112:21-25; 113:1.

29.  ████████████████████████████████████████

████████████████████████████████████████████

████████████ (Banks Dep. 171:2-7; *see also* Pl.'s Mem. Supp. PSJ, Ex. M).  The ACDV did not provide Plaintiff's handwriting exemplar or indicate that Plaintiff claimed under oath that "she did not open the accounts, nor did [she] authorize another person to open them on [her] behalf." (*See, e.g.*, Pl.'s Mem. Supp. PSJ, Ex. M.)

30.  Equifax claims that it sent no less than 36 "ACDVs" to 15 different companies,

each regarding a credit account Plaintiff disputed in her credit reports.  (Banks Decl. ¶¶ 35(ii), 35(iii), 35(iv), 35(vi), 35(ix), 35(xii), 35(xv), 35(xix)).

31.     Of the initial round of communications in September 2012 with its customers regarding these disputed accounts, at least 10 confirmed to Equifax that its reporting of accounts as belonging to the Plaintiff was inaccurate. (Banks Decl. ¶¶ 35(ii), 35(iii), 35(iv), 35(vi), 35(ix), 35(x), 35(xii), 35(xv), 35(xix)).

32.     Equifax's internal records show that 8 of the 10 confirmed inaccurate accounts were deleted as "Mixed CDV." (Pl.'s Mem. Supp. PSJ, Ex. F, at EIS-Thach-000004-000007). One of the other accounts, the First National Bank account, was deleted because First National responded to the ACDV and indicated that the account had the name of Chia Thach, an address of 3181 Monticello Drive, and a different date of birth than Ms. Thach. (Banks Decl. ¶¶ 35(ix)).

33.     Even as to the accounts that did not directly instruct Equifax that the reporting was inaccurate, nearly every one stated that it was not reporting the Plaintiff's known identifying information. (*See* Equifax's Memo. Supp. Mot. SJ at 9). Instead, at best, only a partial match of identifiers existed: 3 reported a different name; 8 reported a different address. *Id*.   Most reported a combination of these obvious differences. *Id*.

34.     Equifax's witness even admitted that Equifax had incorrectly refused to correct a Capital One account and incorrectly failed to investigate the NCO account disputed by the Plaintiff. Banks Dep. 150:2-25 ("A: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"); Banks Dep. 176:18-23 ("▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ . . ."); Banks. Decl. ¶ 35(xvi) ("Plaintiff disputed an NCO Financial account and Equifax inadvertently did not send out this account for reinvestigation.").

15

35.     The Capital One account should have been removed because it did not match Plaintiff's information whatsoever. Banks. Decl. ¶ 35(xvi). Instead, Capital One responded that the account was in the name of "Pat T. Kaia," with an address of 3181 Monticello Drive. *Id.* Because of this information, Ms. Banks admitted that this account would be considered an "agent error." (Ex. 1, Banks Dep. 150:2-8).

36.     It was not until July 2014 when Equifax finally removed the inaccurate accounts from Plaintiff's credit report.  During this litigation, Equifax's defense team have attempted to "verify" the accuracy of its previous credit reporting by obtaining documents – formally and informally – from its customers, including several co-Defendant furnishers who "verified" the accounts. (*See* Pl.'s Mem. Supp. PSJ, Exs. G, H, I, J, K, L). Despite that effort, Equifax has not discovered any evidence – documentary or otherwise – to support its previous reporting that the Plaintiff was responsible for the disputed accounts. (*See* Pl.'s Mem. Supp. PSJ, Exs. G-L).

**F.     Plaintiff's Damages.**

37.     Plaintiff was unable to qualify for a modest $100,000 loan in August 2012 due to the inaccurate information published by Equifax. (Ex. 3, Int. No. 10). Plaintiff's long-time friend, Hai Ho ("Mr. Ho"), had referred her to a mortgage loan officer. After Plaintiff applied for the mortgage, she came to Mr. Ho in tears after she was told that she would not qualify for a loan due to the derogatory information on her credit reports. (Ho Decl. ¶¶ 7-9, attached as Exhibit 8). (Exp.'s Mem. Supp. SJ, Ex. B, Thach Dep. Tr. at 54-58).  Each of the derogatory accounts reported by Equifax did not belong to the Plaintiff, who only ever had seven accounts—all which were positive. (*See* Pl.'s Mem. Supp. PSJ, Ex. B, Thach Decl. ¶¶ 6-8, 13-14, 16).

38.     Plaintiff has also withdrawn herself from the credit market at out fear and embarrassment that she will be again humiliated when her credit report is viewed by a new

prospective creditor and she again will have to try to convince her creditor that the derogatory information in her account does not belong to her. (Ex. 3, Int. No. 10).

39.     Plaintiff's damages also includes the considerable time, effort and expense (including postage) she has been forced to expend attempting to force the Defendant to comply with its statutory obligations. *Id*. Plaintiff has estimated the total time spent in her attempts to resolve these disputes to be in excess of 13 hours at the time she answered the Interrogatories. *Id*. The Plaintiff earned roughly $30 per hour. *Id*.  The estimate of time lost as a dollar impact is thus $390. *Id*. The injury to Ms. Thach was not merely her loss of credit opportunities, but as well the substantial embarrassment, fear, worry and inescapable stress she felt at each stage of her effort to clear her good name.  For example, in her deposition, Plaintiff explained that she felt humiliated in front of Mr. Ho after she could not qualify for the mortgage loan and had to explain that her credit report did not accurately reflect her own good name.  Thach Dep. 89:3-9. Plaintiff had always maintained a good payment history. (*See* Pl.'s Mem. Supp. PSJ, Ex. B, Thach Decl.  ¶ 6-7).   She valued her credit and paid her bills. *Id*. When she was told by the mortgage lenders that she was not able to qualify for any mortgage loan, it was devastating because it was an attack on Ms. Thach's own self-esteem and image. (*See* Ex. 3, Int. No. 10; Ex. 8, Ho Decl. ¶¶ 19-20). At her deposition, Plaintiff testified that she felt trapped and like she couldn't speak with anyone about the credit issues because she was concerned that people would think less of her due to her inability to obtain credit or a home for her family. Thach Dep. 89:3-9. Ms. Thach further testified that she felt ashamed that she could not provide a home for her kids and that she is ashamed that her kids are still struck in a small apartment with her mother – where she must share a room with her near teenage daughter— despite her painstaking effort to save her money. *Id*. at 90:4-11; 42:15-25  Mr. Ho also testified that he observed visible anxiety,

stress, anger, and frustration experienced by Ms. Thach, who he described as previously happy and carefree during previous ten years that he has known her. (Ex. 8, Ho. Decl. ¶¶ 5, 16). However, after she couldn't qualify for the loan and get the problem fixed, Mr. Ho noticed Ms. Thach becoming more and more angry and upset. *Id.* at ¶ 11-16.  Mr. Ho also testified that he observed Plaintiff lose weight because of the worry and that her eyes appeared more dark because she was not getting as much sleep due to her anxiety over her credit reporting problems. *Id.* at ¶ 17.  Mr. Ho further testified that he observed Plaintiff's self worth lowered as a result of the ongoing problems with her credit report and because she feels like she has failed her family because she cannot get credit like everyone else. *Id.* at ¶¶ 18-20.  Ms. Thach explained that she has felt powerless to correct the situation because of her multiple attempts to get the problem fixed. (*See* Ex. 3, Int. No. 10).

## III. A REASONABLE JURY COULD FIND THAT EQUIFAX VIOLATED THE FCRA.

### A.    A Reasonable Jury Could Find that Equifax Violated 15 U.S.C. § 1681e(b).

As this Court has held[2], "In recognition of the critical role that [consumer reporting agencies] play in the credit markets and the serious consequences borne by consumers because of inaccurate information disseminated in consumer credit reports prepared by CRAs, Congress placed on a CRA what can only be described as very high legal duties of care[.]"  *Burke v. Experian Info. Solutions, Inc.*, 1:10-CV-1064 AJT/TRJ, 2011 WL 1085874 (E.D. Va. Mar. 18, 2011).  As the Fourth Circuit has cautioned:  "The issue of whether the agency failed to follow 'reasonable procedures' will be a 'jury question[ ] in the overwhelming majority of cases.'

---

[2] Both Defendants have substantial experience in this District and Circuit. Nevertheless, they largely fail to discuss, consider, distinguish or even mention this uniform chain of jurisprudence because it is largely at odds with the contentions in these motions.

*Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 416 (4th Cir. 2001).[3] The FCRA obligates CRAs to follow "reasonable procedures to assure maximum possible accuracy" in their credit reporting. 15 U.S.C. § 1681e(b). "[A] consumer reporting agency violates § 1681e(b) if (1) the consumer report contains inaccurate information and (2) the reporting agency did not follow reasonable procedures to assure maximum possible accuracy." *Dalton*, at 415.

It is undisputable that Equifax furnished inaccurate credit reports about her. Defendant's own records show that it made no less than 7 third party reports to Plaintiff's potential creditors on October 4, 2011, August 2, 2012, August 6, 2012, August 10, 2012, August 13, 2012, August 20, 2012, and September 10, 2012. (Ex. 4, at Pl.'s Ex. #000043-000044) (*see also* Exs. 5 & 6). "Reasonable procedures are those that a reasonably prudent person would [undertake] under the circumstances." *Schweitzer v. Equifax Info. Solutions LLC*, 441 F. App'x 896, 903 (3d Cir. 2011) (internal quotations and citations omitted). This Court has explained that a CRA's duty under § 1681e(b), though less rigorous than under the dispute provision, § 1681i(a), still entails a requirement that the CRA have conducted an "investigation" to determine if the information it is to report is maximally accurate. In considering the same arguments that Defendants make in this case, this Court explained that the text of the statute and the obvious meaning of its terms demands that the CRA include within its "reasonable procedures" an initial examination and investigation to ensure the maximum possible accuracy of its reporting. *Burke*, 2011 WL 1085874. ("It is difficult to imagine how 'maximum possible accuracy' could be guaranteed without an adequate investigation. Likewise, Section 1681i(a)(1)(A) requires a 'reinvestigation,' necessarily implying that an "investigation" was required to have been performed in the first

---

[3] *See also Burke*, 2011 WL 1085874 ("Given the fact intensive nature of these inquiries, "[t]he issue of whether the agency failed to follow 'reasonable procedures' will be a 'jury question[ ] in the overwhelming majority of cases.' " *Dalton*, 257 F.3d at 416, quoting *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir.1995).")

instance."). There is literally zero evidence that Equifax has ever vetted the specific subscribers –most "bottom feeder" debt buyers – to determine whether they maintained accurate records. The furnishers in this case were entire strangers to Equifax.[4]

In this case, Equifax defends its conduct by trying to consider each event, each account and each dispute in isolation. But in context, Equifax received constant and enormous red flags to place it on notice that its reporting and merger of these various inaccurate accounts with the Plaintiff's credit file was – at a minimum – not reasonably prudent to ensure maximum possible accuracy. For example, in 2009, it received a warning, added to Equifax's actual file, which stated: "FRAUD VICTIM… 10/26/2009, FRAUD VICTIM…." (Ex. 7, at EIS-Thach-000141). Rather than accept this as its own caution, Equifax ignores such notice, deferring its use entirely to its furnisher customers. (Ex. 1, Banks Dep. 38:23-25, 39:1-15, 97:19-25, 98:1-6, 98:21-25, 99:1-3). Further, despite its claims in this posture, Equifax's own internal notes show that its computer had determined this to be a "mixed file." (Pl.'s Mem. Supp. PSJ, Ex. F, at EIS-Thach-000004-000007). Then, despite uninterrupted reporting of the same full name, same SSN, same date of birth and same address from at least 2005, Equifax began combining a wide assortment of identities with Ms. Thach's credit file. (*See* Exs. 4-7).

This reporting was logically inconsistent. Certainly a jury could find that at a minimum these inconsistencies should have placed Equifax on notice that something out of the ordinary existed in this file. In addition to the *a priori* obligation to vet and consider the accuracy and reliability of data when first reported, a CRA must also be aware of patterns or indicia of suspect

---

[4] Certainly Equifax had nearly a year of litigation to find, produce or even proffer such documents or evidence if it was favorable to its argument. Its refusal to do so is certainly admissible presumption that any such records – or lack of records –would have been unfavorable to its position. See, e.g., *United States v. Hines,* 470 F.2d 225, 230 (3d Cir.1972) ("The applicability of a 'missing witness' inference is based on the simple proposition that if a party who has evidence which bears on the issue fails to present it, it must be presumed that such evidence would be detrimental to his cause.").

reliability of its reported data.     16 C.F.R. Part 600 FTC Commentary Appendix 607 (3)(A). ("[W]hen a consumer reporting agency learns or should reasonably be aware of errors in its reports that may indicate systematic problems (by virtue of information from consumers, report users, from periodic review of its reporting system, or otherwise) it must review its procedures for assuring accuracy.")[5]

The evidence strongly supports a finding that Equifax's procedures were unreasonable and imprudent to ensure maximum possible accuracy.[6]

**B.      A Reasonable Jury Could Find that Equifax Violated 15 U.S.C. § 1681i(a).**

Plaintiff will also establish that Equifax violated FCRA § 1681i(a) by its failure to conduct the rigorous reinvestigation required upon receiving the Plaintiff's disputes, to consider the relevant information Ms. Thach provided it with those disputes or to otherwise forward her relevant information in it to its customer/furnishers.[7] The first and most important of these

---

[5] As the FTC has cautioned Equifax, "A CRA must accurately transcribe, store and communicate consumer information received from a source that it reasonably believes to be reputable, in a manner that is logical on its face. ... Similarly, it should establish procedures to avoid reporting information from its furnishers that appears implausible or inconsistent. … A CRA must maintain procedures to avoid reporting information with obvious logical inconsistencies." *See* "40 Years of Experience with the Fair Credit Reporting Act, an FTC Staff Report with Summary           Interpretations,"           at           67-68,           81           (2011).           See http://www.ftc.gov/sites/default/files/documents/reports/40-years-experience-fair-credit-reporting-act-ftc-staff-report-summary-interpretations/110720fcrareport.pdf.

[6] To prevail on Defendant's motion, Ms. Thach must only show that there is a question of fact as to such reasonableness.   As the Fourth Circuit found in *Dalton*: "This case is easily grouped within the 'overwhelming majority of cases'" in which "[t]he issue of whether the agency failed to follow 'reasonable procedures' will be a 'jury question.'" 257 F.3d at 416.

[7] With the superfluous text removed, 15 U.S.C. §1681i(a) imposes the following duties all of which Equifax violated:

    1   If the completeness or accuracy of any item of information contained in a consumer's file is disputed by the consumer directly, the agency shall conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file. §1681i(a)(2)(A).

    2   The notice [that the CRA provides to the creditor/furnisher after receiving the

requirements, the word "reinvestigation" must be understood by its ordinary meaning – a rigorous searching inquiry.  As the Fourth Circuit explained in *Johnson v. MBNA*:

> The key term at issue here, "investigation," is defined as "[a] detailed inquiry or systematic examination." Am. Heritage Dictionary 920 (4th ed.2000); see Webster's Third New Int'l Dictionary 1189 (1981) (defining "investigation" as "a searching inquiry").

357 F.3d 426, 430 (4th Cir. 2004).[8]  This Court has confirmed that this definition applies equally in force for the "reinvestigation" under § 1681i(a) required of a CRA such as Equifax.  *Mullins v. Equifax Info. Servs., LLC*, CIV. 3:05CV888, 2007 WL 2471080 (E.D. Va. Aug. 27, 2007) ("In instruction 18, the Court gave 'reinvestigation' a similar definition as 'investigation.' TU objects that this contradicts decisional law because the Fourth Circuit in *Johnson v. MBNA* recognized that 'creditors and credit reporting agencies have different roles in investigating consumer disputes under the FCRA.' 357 F.3d 426, 432 (4th Cir.2004). The Court rejected that argument at the instructions hearing (Trial Tr. at 512:13-19), and TU gives it no reason here to reconsider that decision here.").[9]   Thus, when Equifax received the Plaintiff's several disputes, it was required

---

       consumer's dispute] shall include all relevant information regarding the dispute that the agency has received from the consumer.  §1681i(a)(2)(A).

3    The consumer reporting agency shall review and consider all relevant information submitted by the consumer. §1681i(a)(4).

4    [The CRA must immediately remove disputed information if it determines that] the information that is the subject of the reinvestigation is […] inaccurate or incomplete or […] cannot be verified. §§1681i(a)(2)(C) and 1681i(a)(5).

[8] This Court also similarly held as much even before the Fourth Circuit affirmed Judge Williams' decision. *Ayers v. Equifax Info. Servs.*, 2003 WL 23142201 (E.D. Va. Dec. 16, 2003).

[9] The "reinvestigation" duty of a CRA such as Equifax is a fact-driven balancing test that weighs the burden of conducting a more substantive investigation against the possible harm to the affected consumer.  …a 'balancing test' that weighs the cost of verifying the accuracy of the information versus the possible harm of reporting inaccurate information, and this test becomes markedly more favorable to plaintiff's who have disputed the accuracy of the information in their credit reports."  *Burke*, 2011 WL 1085874 (E.D. Va. Mar. 18, 2011) citing "*Johnson*, 357 F.3d at 432–33, citing with approval *Cushman v. Trans Union Corp.*, 115 F .3d 220, 225 (3d Cir.1997)".

to conduct "[a] detailed inquiry or systematic examination" to determine or ensure that its attribution of the challenges accounts to the Plaintiff was correct.   It plainly did not do so.

In *Burke*, this Court cited the Third Circuit's seminal decision, *Cushman v. Trans Union,* 115 F.3d at 225 (3rd Cir. 1997).  This is without question the leading case defining a CRA's FCRA duties under 15 U.S.C. §1681i.[10]   In fact, it was cited by the Fourth Circuit in its "what is a FCRA investigation" case, *Johnson v. MBNA America Bank, NA*, 357 F.3d 426, 432 (4th Cir. 2004).  Contrary to Equifax's bare assertions, §1681i does require more that merely "parroting" the creditor's response.  *Cushman*, 115 F.3d at 225. ("The 'grave responsibilit[y]' imposed by ' 1681i(a) must consist of something more than merely parroting information received from other sources. Therefore, a "reinvestigation" that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute.").

This Court has had multiple opportunities to consider and reject the CRA argument that an automated dispute (ACDV) system that merely accepts whatever the CRA customer/furnisher tells it to accept is lawful. For example, in a §1681i(a) jury trial that took place in this courthouse, Judge Payne instructed the jury:

> In assessing the issue of notice to Trans Union, you are instructed that, on several occasions since 1997, decisions of federal courts have informed… that the Fair Credit Reporting Act's Requirement for a reasonable reinvestigation must consist of something more than simply the parroting of information received from other sources and/or that a credit reporting agency does not act reasonably by deferring entirely to another source of information, such as a creditor.

Attached as Exhibit 9 is the jury instructions from *Mullins v. Equifax Info. Servs., LLC*, CIV. 3:05CV888 (E.D. Va. Aug. 27, 2007). Equifax made and lost exactly the same arguments multiple times before this Court in the Alexandria Division, with significant jury verdicts upheld

---

[10] It is cited by nearly every Court applying §1681i and stands for the proposition that a §1681i(a) reinvestigation requires more than merely "parroting" the creditor/furnisher.

by the Fourth Circuit.[11] And more recently, co-Defendant Experian advanced the same discredited "ACDV" refrain to a Court with a predictable result:

> Experian seeks summary judgment based on the proposition that by sending the ACDV to Litton, without more, it discharged its duty of reinvestigation as a matter of law. …Given the purpose for which a reinvestigation was required, a fact finder could conclude that Experian had failed to conduct a reasonable investigation "to assure maximum possible accuracy" in Burke's credit report. Experian knew virtually nothing about that dispute, other than it existed; and Experian's use of an ACDV request to Litton did little to focus Litton on the nature of the dispute. In his March 15, 2010, letter to Experian, Burke plainly offered to provide additional information about the dispute when he stated, "If you require any additional information from me related to this dispute, please contact me" and provided his telephone number.

*Burke*, 2011 WL 1085874 (E.D. Va. Mar. 18, 2011).[12]

---

[11] *Sloane v. Equifax Info. Servs., LLC*, 510 F.3d 495, 500 (4th Cir. 2007) ("In this case, the jury specifically found, via a special verdict, that Suzanne proved by a preponderance of the evidence that Equifax violated the FCRA by negligently: (1) failing to follow reasonable procedures designed to assure maximum accuracy on her consumer credit report; (2) failing to conduct a reasonable investigation to determine whether disputed information in her credit report was inaccurate; (3) failing to delete information from the report that it found after reinvestigation to be inaccurate, incomplete, or unverified; and (4) reinserting information into her credit file that it had previously deleted. On appeal, Equifax does not challenge the jury's findings that Suzanne proved that it violated the FCRA in all of these respects."); *Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 237 (4th Cir. 2009) ("A jury found that Equifax had violated the FCRA in numerous respects and awarded Robinson $200,000 in actual damages.").

[12] Even beyond the decisions in this District and Circuit, Equifax has had actual notice from numerous other courts that its blind ACDV "parroting" was unlawful. *See e.g. Schweitzer v. Equifax Info. Solutions LLC*, 441 F. App'x 896, 904 (3d Cir. 2011); *Pourfard v. Equifax Info. Servs. LLC*, 2010 WL 55446 (D. Or. Jan. 7, 2010) ("the caselaw is clear that a reporting agency does not act reasonably under the FCRA by deferring entirely to another source of information.")(citing *Cushman*); *Bradshaw v. BAC Home Loans Servicing, LP*, 816 F. Supp. 2d 1066, 1073-74 (D. Or. 2011)("[Equifax] instead utilized an automated dispute system to verify the accuracy of plaintiffs' account. Many courts, including this one, have concluded that where a CRA is affirmatively on notice that information received from a creditor may be suspect, it is unreasonable as a matter of law for the agency to simply verify the creditor's information through the ACDV process without additional investigation.")(citations omitted).

In addition, Equifax has even been criticized for such reliance on its partial matching procedures and its parroting ACDV system in its own federal district in a fact pattern exactly like that *sub judice*. *Moore v. Equifax Info. Servs. LLC*, 333 F. Supp. 2d 1360, 1365 (N.D. Ga. 2004) *See also Sampson v. Equifax Info. Servs., LLC*, 2005 WL 2095092 *6 (S.D. Ga. Aug. 29, 2005)("it is a question of fact whether Equifax conducted a reasonable investigation by following its course of conduct here, without seeking more specific information from the consumer.").

The Plaintiff made several detailed disputes – in writing.  She provided handwriting samples.  She explained the substance of the problem.  She made her dispute under oath and penalty of perjury.   She provided her direct contact details, her government identification and her phone bill showing her verified address.  And still, Equifax did absolutely no investigation.  By its own account, the best that it did was to have its third party vendor reduce Ms. Thach's detailed letters into two digit codes for automated processing.   Equifax ignored that in September/October 2012, at least 10 of its furnishers immediately confirmed that Equifax's previous reporting was inaccurate. It had no procedure in place to reconcile the numerous conflicts returned in the dispute responses for reported identifiers – addresses, first and middle names and lack of SSNs.  Instead, if a creditor did not expressly instruct Equifax to delete, the Defendant deferred entirely to the automated command of its customer/furnishers and continued to report the account as belonging to Ms. Thach.

A reasonable jury could more than find that Equifax violated § 1681i(a)(2) and (a)(4) in failing to substantively investigate Ms. Thach's disputes, failing to consider the relevant information she provided and failing to forward her disputes and information to the

---

(continued…)

Equifax's retreat to its partial matching rules as somehow legally tolerable has also been rejected when the CRA has notice of a possible failure in those procedures.  *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230-32 (D.N.M. 2006)("In deciding similar claims, courts have reasoned that such "exclusive reliance" on furnishers of credit information and standardized procedures such as partial matching logic 'may not be justified once the credit reporting agency receives notice that the consumer disputes information contained in his [or her] credit report.' ... In such situations, "[i]t would make little sense to conclude that, in creating a system intended to give consumers a means to dispute—and, ultimately, correct—inaccurate information on their credit reports, Congress used the term 'investigation' to include [only] superficial ... inquiries by creditors" that "do not look beyond the [automated] information" in their own computer systems and "never consult underlying documents such as account applications" and the like. *Johnson,* 357 F.3d at 430–31.")

creditor/furnishers. And Equifax concedes that it violated §1681i(a)(2)(A) by refusing to forward the Plaintiff's dispute and "all relevant information" to its furnishers instead of (or at least in addition to) the 2 digit ACDV code. (Ex. 1, Banks Dep. at 113:2-10). But a jury could also find that Equifax violated the related provisions accompanying its reinvestigation duty. Contrary to Defendant's claim, it did violation § 1681i(a)(5) by failing to delete and correct information "found to be inaccurate or incomplete or [that] cannot be verified." 15 U.S.C. § 1681i(a)(5). Equifax's own willful blindness to the incompleteness of its "investigation" results is amazing. None or close to none of its furnishers came back reporting a complete match to the Plaintiff's identifiers. And still it reported them as belonging to Ms. Thach.

There is a factual dispute as to whether or not Equifax ever forwarded to Ms. Thach its "investigation" results to Plaintiff's September 2012 dispute. Accordingly, a jury could find that Equifax also violated § 1681i(a)(6). Summary Judgment as to §1681i(a) should be denied.

### IV. A REASONABLE JURY COULD FIND ACTUAL DAMAGES.

Equifax itself does not make a substantive argument that the Plaintiff was not injured or did not suffer actual damages. First, Defendant contends that Plaintiff has not incurred any economic damages as a result of its violation of § 1681i(a) because her multiple attempts to obtain a mortgage in August 2012 occurred before Ms. Thach made her direct disputes. The problem for Equifax here is two-fold. First, the injuries she suffered from these August 2012 events, though pre-dispute, are compensable as violations caused by Equifax's failure to comply with § 1681e(b). Equifax does not in its argument challenge that Ms. Thach's attempts to obtain a mortgage loan and buy a home in August 2012 were caused in substantial part by Equifax's inaccurate credit reporting and violation of § 1681e(b).

Second, Equifax ignores the broad range of other economic damages that the Plaintiff is

entitled to present to a jury. She has testified that she was taken out of the credit market entirely because of continuing derogatory inaccurate credit reports issued by the Defendants. She knew she could not obtain credit and could not stomach the attempt while her reports remained fatally blemished. Equifax understands that this lost credit opportunity is an established measure of FCRA damages. In fact, in 2012 in a FCRA "failure to investigate" case that led to one of its worst jury losses ($1.8 million in punitive damages), Equifax made and lost a challenge to such damage claims:

> Plaintiff asserts she did not apply for additional credit after these denials for fear that her new applications would be denied as well. She also contends her reputation has been damaged as a result of Equifax's actions. Defendant, in turn, argues Plaintiff was unable to identify any specific lost credit opportunities and, in any event, any purported damage to her reputation is speculative. The Court disagrees that Plaintiff's fear of lost credit opportunities and/or damage to her reputation is speculative or factually implausible. … Accordingly, the Court denies Defendant's Motion for Partial Summary Judgment on this ground as well.

*Miller v. Equifax Info. Servs., LLC*, 3-11-CV-01231-BR, 2012 WL 5984656 (D. Or. Nov. 28, 2012).

Further, though modest, the damage a consumer incurs in trying to obtain correction of her credit report is fully compensable under the FCRA. *Robinson v. Equifax Info. Servs, LLC*, 560 F.3d 235, 246 (4th Cir. 2009) ("Based on our review of the record, we also conclude that Robinson proffered sufficient evidence of loss of income from time missed from work addressing Equifax's errors."); *Dixon-Rollins v. Experian Info. Solutions, Inc.*, No. 09-0646, 2010 WL 4939441 (E.D. Pa. Sept. 23, 2010) ("At the very least, she is entitled to damages suffered in connection with her efforts to correct the error in Trans Union's credit report.); *see Cortez*, 617 F.3d at 717("Time spent trying to resolve problems with the credit reporting agency may also be taken into account."). Ms. Thach has testified to such a loss. (*See, e.g.*, Ex. 3, Int. No. 10).

Lastly, Equifax tries to piggy-back upon Experian's independent challenge to Ms. Thach's non-economic damages. Docket No. 124, at 16. "Actual damages may include not only economic damages, but also damages for humiliation and mental distress." *Sloane v. Equifax Info. Servs., LLC*, 510 F.3d 495, 500 (4th Cir. 2007))(citations omitted). Given the page limits imposed on the Parties and the individualized arguments as to liability otherwise made separately by each Defendant, this "incorporation by mention" is improper and should be ignored. Further, Plaintiff answers Experian's argument where made. She relies on that opposition as her answer as well to Equifax's attempt. And she has more than established a jury question in her facts above.

## V.    A REASONABLE JURY COULD FIND THAT EQUIFAX WAS WILLFUL.

Nearly every court to consider Equifax's current procedures and its argument that its FCRA conduct was not willful has denied Equifax's motion.[13]   There is more than sufficient evidence and basis to deny summary judgment. Despite the Fourth Circuit's admonition in *Dalton* that "summary judgment is 'seldom appropriate' on whether a party possessed a particular state of mind," *Dalton,* 257 F.3d at 418, Equifax still asks the Court to take from the jury the question of whether its conduct and policies were willful.[14]  The Court should decline this invitation to narrowly and unreasonably constrain the FCRA.[15]

---

[13] Equifax chose page 18 of its brief to cite its first decision from this Circuit or District. The one it cites, *Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 241 n.3 (4th Cir. 2009), is inapposite to this case and posture. In Robison, Judge Lee did not grant summary judgment on willfulness, but rather found after trial that there was no evidence presented as to that claim. The Fourth Circuit affirmed that outcome in a short footnote.

[14] Willfulness is nearly always a question of fact for the jury. *Lenox v. Equifax Info. Servs. LLC,* 2007 WL 1406914, at *6 (D. Or. May 7, 2007)(reasoning "whether defendant's action or inaction rises to the level of willfulness so as to violate the statutory obligations of the FCRA is also a question of fact"); *Guimond v. Trans Union Credit Info. Co.,* 45 F.3d 1329, 1333 (9th Cir.1995)(recognizing "The reasonableness of the procedures and whether the agency followed them will be jury questions in the overwhelming majority of cases."); *Cahlin v. Gen'l Motors Acceptance Corp.,* 936 F.2d 1151, 1156 (11th Cir.1991); *Centuouri v. Experian Info. Solutions,*

28

The Court need not look far to find comparable legal authority to deny Equifax's motion.

In *Mullins v. Equifax Info. Servs., LLC*, Judge Payne entered a jury verdict based on far weaker facts than in this case, based upon the CRA's established ACDV alternative to a real investigation, and the fact that the defendant had substantial notice that these procedures violated the FCRA. The Court explained:

> The case was tried on, and the jury was instructed pursuant to, the law of this circuit at the time of trial in the issue of willfulness. See *e.g., Dalton v. Capital Associated Industries, Inc.,* 257 F.3d 409 (4th Cir.2001). Thereafter, the Supreme Court of the United States decided *Safeco Ins. Co. of America v. Burr,* 127 S.Ct. 2201 (2007) which actually articulated a standard for willfulness that was less stringent than the standard which controlled the trial and the jury verdict.

> Viewed as a whole, the record here supports a finding of willfulness under either standard. The plaintiff presented evidence from which the jury reasonably found TU deliberately and consciously committed the violations of the FCRA found by the jury. Certainly, the evidence supports a finding under the rule of *Safeco.* Indeed, from the record, the jury reasonably could have inferred that TU has chosen to disobey the FCRA's reinvestigation and related provisions because it is less expensive to do so, even if it loses a few cases, than it is to comply with the statute.

<hr />

(continued...)

*Inc.,* 431 F.Supp.2d 1002, 1007 (D.Ariz.2006)(refusing to grant summary judgment on the issue of willfulness in a case involving the reasonableness of consumer protection procedures); *Holmes v. Telecheck Int'l, Inc.,* 556 F. Supp. 2d 819, 847 (M.D. Tenn. 2008).

[15] Under the FCRA, a person who "negligently" violates its provisions is liable for actual damages under 15 U.S.C. §1681o. If a jury finds that the violations were "willful", then the defendant can be liable for punitive damages under 15 U.S.C. §1681n. Unlike Virginia's common law torts, "A showing of malice or evil motive is not required to prove willfulness under the Act." *Dalton,* 257 F.3d at 418. A defendant may "willfully violate the FCRA by adopting a policy with reckless disregard of whether it contravenes a plaintiff's rights under the FCRA." *Cortez v. Trans Union, LLC*, 617 F.3d 688, 721-22 (3d Cir. 2010) (citing *Safeco Ins. Co. of America v. Burr,* 127 S.Ct. 2201 (2007)). The "FCRA is concerned with whether the defendant ran an unjustifiably high risk of *violating the law.*" *Drew v. Equifax Info. Servs., LLC*, C 07-00726 SI, 2010 WL 5022466 (N.D. Cal. Dec. 3, 2010). Even a single FCRA dispute can support a willfulness verdict. *Saunders v. Branch Banking And Trust Co. Of VA*, 526 F.3d 142, 151 (4th Cir. 2008).

*Mullins v. Equifax Info. Servs., LLC*, CIV. 3:05CV888, 2007 WL 2471080 (E.D. Va. Aug. 27, 2007). Equifax has received substantial judicial criticism and notice of its non-compliance. In an on the record exchange with Magistrate Judge Davis on August 29, 2014, in a similar case regarding the burden of producing information regarding past lawsuit about its reinvestigation procedures, Equifax's attorney stated "Equifax receives thousands of complaints from consumers of a whole variety of things." (*Tamblay*, Motion to Compel Hr'g Tr. 14:7-9, Aug. 29, 2014). To which Judge Davis responded "And you don't see a problem with that?" *Id.* at 14:10. But it is not just the thousands of lawsuits that are filed against Equifax and then confidentially settled that should give it pause. Equifax has suffered most of the largest jury verdicts entered under 15 U.S.C. § 1681i. Besides the two Fourth Circuit decisions mentioned above, and others throughout the country, more recently, Equifax has suffered a jury verdict with punitive damages of $1.8 million in which the Court held:

> Despite Miller's repeated notices to Equifax and Equifax's numerous reports to Miller that it had investigated her complaints, Equifax did not correct the problem. In fact, Equifax did not take steps to correct the information in Miller's file until she filed this action after her two years of efforts proved fruitless. Nevertheless, Equifax argued to the jury that taking corrective steps only after a civil action is filed complied with its "policy." … As noted, the jury found Equifax acted willfully when it violated Miller's FCRA rights. The Court agrees with Miller that the jury's Verdict supports a conclusion that Equifax's conduct was more than merely indifferent to Miller's rights and, in fact, resembled reckless disregard of those rights in light of the fact that Miller's repeated efforts over two years to get Equifax to correct its errors went completely unheeded. … As noted, the Court has concluded under the first *Gore* guidepost that Equifax's conduct was sufficiently reprehensible to justify a substantial award of punitive damages.

*Miller v. Equifax Info. Servs., LLC.*, 3:11-CV-01231-BR, 2014 WL 2123560 (D. Or. May 20, 2014). This conclusion – that Equifax had recklessness refused to perform an actual

investigation instead of its automated processing has been reached again and again in its cases.[16]

Given the clearly established legal standard of which Equifax has frequently been apprised (detailed in this section as well as in *Section III* above), and the multiple jury verdicts and court decisions it has suffered, Equifax is clearly a recidivist violator. As a sister court explained in discussing the identical problem posed by Equifax's industry cohort, when a CRA "has been warned of its inadequate reinvestigation practices in prior cases, it may be considered a repeat FCRA offender." *Dixon-Rollins v. Experian Info. Solutions, Inc.*, 753 F. Supp. 2d 452, 465 (E.D. Pa. 2010). Its "refusal to modify its reinvestigation procedures and insistence on mimicking the original sources' responses supports the conclusion that punitive damages are necessary to deter future violations." Additionally, when "after receiving numerous warnings" the CRA "continues to ignore its obligation to forward relevant material provided by consumers to the original source further support[s] the conclusion that it is a repeat FCRA violator." *Id.*

## CONCLUSION

---

[16] *See e.g. Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230-32 (D.N.M. 2006) ("Plaintiff has presented evidence that Equifax was aware that its use of partial matching logic to build consumer credit files could result in "mixed file" situations like this one, and that its standardized CDV procedure alone would be inadequate to correct such situations. ... Combined with the evidence suggesting that Equifax failed to offer any appeal procedure or quality-control mechanism to correct such deficiencies in Plaintiff's case, but instead waited until after this litigation commenced to take Plaintiff's credit file "off line," a rational factfinder could conclude that Equifax willfully violated the FCRA."); *Sheffer v. Experian Info. Solutions, Inc.*, 2003 WL 21710573 (E.D. Pa. July 24, 2003) ("Equifax contend[s] that Plaintiff cannot show "wilfulness" under the FCRA. I disagree …. As another court has held, punitive damages may be warranted where the evidence shows that inaccuracies in credit reports arise from something more than "an isolated instance of human error which [the agency] promptly cure[s].")(citation omitted); *Sampson v. Equifax Info. Servs., LLC*, 2005 WL 2095092 (S.D. Ga. Aug. 29, 2005) ("Considering all the facts, the Court cannot determine, as a matter of law, that punitive damages are unavailable. *See, e.g., Spector v. Equifax Info. Servs.*, 338 F.Supp.2d 378, 389 (D.Conn.2004) ("[i]t is significant that one factor singled out as supporting a willfulness conclusion was the need for legal process to force compliance.").

For the reasons stated herein, the Plaintiff, Thanh Thach, respectfully requests the Court to deny Equifax's Motion for Summary Judgment.

Respectfully Submitted,

**THANH THACH**

By:_____/s/_____
Kristi Cahoon Kelly, VSB #72791
Andrew J. Guzzo, VSB #82170
Kelly & Crandall, PLC
4084 University Drive, Suite 202A
Fairfax, VA  22030
(703) 424-7570 – Telephone
(703) 591-0167 – Facsimile
E-mail:  kkelly@kellyandcrandall.com
E-mail:  aguzzo@kellyandcrandall.com

Leonard A. Bennett, VSB # 37523
Susan Rotkis, Esq., VSB #40693
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd. 1A
Newport News, Virginia 23601
Telephone:  (757) 930-3660
Facsimile:  (757) 930-3662
Email: lenbennett@clalegal.com
Email: srotkis@clalegal.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that on the 19th day of September, 2014, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which sent notification of such filing to the following:

John Anthony Love
Barry Goheen
Ian E. Smith
King & Spalding
1180 Peachtree St NE
Atlanta, GA  30309-3521
E-mail:  tlove@kslaw.com
E-mail:  bgoheen@kslaw.com
E-mail:  iesmith@kslaw.com
*Counsel for Equifax Information Services,*
*LLC*

Joseph William Clark
Daniel D. DeVougas
Jones Day
51 Louisiana Ave NW
Washington, DC 20001
202-879-3939
Fax: 202-626-1700
Email: jwclark@jonesday.com
Email: ddevougas@jonesday.com
*Counsel for Experian Info. Solutions, Inc.*

John Willard Montgomery, Jr.
John W. Montgomery Jr. Attorney PLC
2116 Dabney Rd
Suite A-1
Richmond, VA 23230
(804) 355-8744
Fax: 804-355-8748
Email: jmontgomery@jwm-law.com
*Counsel for Equifax Information Services,*
*LLC*

Timothy James St. George
Troutman Sanders LLP
Troutman Sanders Bldg
1001 Haxall Point
PO Box 1122
Richmond, VA 23219
Email: tim.stgeorge@troutmansanders.com
*Counsel for Experian Info. Solutions, Inc.*

_____/s/_____
Kristi C. Kelly, VSB #72791
KELLY & CRANDALL, PLC
4084 University Drive, Suite 202A
Fairfax, VA  22030
(703) 424-7570 – Telephone
(703) 591-0167 – Facsimile
E-mail:  kkelly@kellyandcrandall.com
*Counsel for Plaintiff*