**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

**THANH THACH,**

        **Plaintiff,**

**v.**                                 **Civil Action No. 3:14-cv-0070 (HEH)**

**EQUIFAX INFORMATION SERVICES,
LLC,** *et al.,*

        **Defendants.**

**PLAINTIFF'S OPPOSITION TO DEFENDANT EXPERIAN INFORMATION
SOLUTIONS, LLC'S MOTION FOR SUMMARY JUDGMENT**

COMES NOW, the Plaintiff, THANH THACH ("Ms. Thach"), by counsel, and in opposition to the Motion for Summary Judgment filed by Defendant Experian Information Solutions, LLC ("Experian"), she states as follows:

## I.   INTRODUCTION

In a case where the Plaintiff made two disputes over a 6 month period, after which at least 2 highly derogatory and inaccurate items remained in her credit file and were published to multiple different third parties, Experian nevertheless summons the temerity to ask this Court to find that there is no genuine issue of material fact, and that Experian is entitled to judgment as a matter of law.  Indeed - the evidence strongly supports a finding that Equifax's procedures were unreasonable and imprudent to assure maximum possible accuracy.  Nevertheless, to prevail on Defendant's motion, Ms. Thach must only show that there is a question of fact as to such reasonableness. As the Fourth Circuit found in *Dalton v. Capital Associated Indus., Inc.*, "This case is easily grouped within the 'overwhelming majority of cases'" in which "[t]he issue of whether the agency failed to follow 'reasonable procedures' will be a 'jury question.'" 257 F.3d at 416. The troubling facts of this case are a prime example of a situation in which Plaintiff should be permitted to present her story to a jury and receive their verdict.

## II.      PLAINTIFF'S STATEMENT OF FACTS

Defendant's statement of facts combines some "facts" that are plainly untrue and others that are grossly incomplete. Plaintiff addresses these below pursuant to Local Rule 56. Plaintiff's additional material facts follow.  The following facts are disputed.

### A. Experian's Statement of Facts.

5-6.  Experian correctly states that Plaintiff applied for a $100,000 mortgage from C&F Mortgage and McLean Mortgage around August 2012, and provided her income information to both companies. Experian omits that the application process was not completed because once both entities obtained copies of her credit reports, they immediately notified her that there was no way she would be able to obtain a mortgage with their offices based solely on her credit. (*See* Pl.'s Mem. Supp. PSJ, Ex. B,

Thach Decl. ¶ 10). (Exp.'s Mem. Supp. SJ, Ex. B, Thach Dep. Tr. at 54-58).

7. Plaintiff did suffer mental and emotional distress as a result of these mortgage denials, but Plaintiff has also testified that the mental and emotional distress that she suffers is not limited to the mortgage denials, but also to the fact that Experian refused to correct the inaccurate information in her credit report. Plaintiff directs the Court to Plaintiff's Section herein regarding her damages.

9. Plaintiff disputes Experian's assertion that "both Experian and First Premier Bank had a 100% match…". First Premier Bank ACDVs confirm First Premier provided multiple current addresses to Experian that were not hers. (*See* Ex. E to Exp's MSJ). Further, First Premier Bank's documents indicate that it sent statements to an address that did not belong to the Plaintiff and received payments from someone other than the Plaintiff on the account.  (*See* Pl.'s Mem. Supp. PSJ, Exs. I and J). In addition, Experian's own documents identify a previous fraud alert (Exp.'s Mem. Supp. SJ, Ex. C at 0000263 and 0000267) and "current address conflict" (Attached as Exhibit 1 is Experian's Disclosure Log).

12. Plaintiff agrees that she sent a second dispute letter on June 3, 2013. However, Experian's assertion that it did not contain "new evidence" regarding the First Premier accounts is misleading. Plaintiff's letter once again stated that these items did not belong to her, but she was not in possession of any additional information—such as the documents in the possession of First Premier—that showed the account was being paid by someone else. (*See* Pl.'s Mem. Supp. PSJ, Ex. J).

14. Experian records demonstrate that there were numerous name variations and multiple addresses that should not be associated with the Plaintiff in her Experian credit disclosure. Experian's records and the unrefuted expert opinion of Evan Hendricks do indicate that there is evidence that Plaintiff's file was mixed as Experian's Transaction Logs indicate that on multiple occasions, the furnisher provided a different name, social security number and address for the item that reported in her credit file. (*See* Pl.'s Mem. Supp. PSJ, Exs. P and Q).  *See* Section B below.

15. Experian's sentence is misleading because it claims that First Premier Bank provided an

address that appeared on her *credit disclosure*. This is incorrect as Experian never responded to Plaintiff's request for her disclosure in August 2012. To the extent this sentence refers to the September 2009 disclosure, Plaintiff does not recall requesting or receiving that disclosure from Experian. Further, as noted in Section B below, there were multiple addresses in Plaintiff's credit file that were inaccurate and did not belong to her, including the addresses First Premier Bank provided to Experian.

18. When asked if she was the victim of identity theft or consumer fraud, Plaintiff's response was: "to tell you the truth I don't know that but [I know] the fact that the record shows that my file is mixed with someone else's and the names and address and phone number that's on my [consumer disclosure] and I don't think that should be how that works." (Exp.'s Mem. Supp. SJ, Ex. B, Thach Dep. Tr. at 195:11-19).

### (ADDITIONAL FACTS)

**B.   Experian Had Notice as Early as January 2009 of Potential Fraud and Inaccuracies in Plaintiff's Credit File.**

53.   In October 2009, Experian was on actual notice of potential fraud and/or unauthorized use of Ms. Thach's credit file. On September 8, 2009, Experian mailed a credit report to Plaintiff at her address at 2926 Monticello Drive, Falls Church, VA 22042. (Exp.'s Mem. Supp. SJ, Ex. C at 0000245).

54.   The September 8, 2009 consumer disclosure contained several name variations that in no way resembled Plaintiff's name, including: Thanh Phach, Trang T. Thach, Thanh T. Thach, Phanh Cham Thach, Chia Thach, Phamh Thach, Chai C. Thach. (Exp.'s Mem. Supp. SJ, Ex. C at 0000259). Less than two months later, on October 26, 2009, Experian then mailed a fraud alert to Plaintiff at her address of 2926 Monticello Drive, Falls Church, VA 22042. (Exp.'s Mem. Supp. SJ, Ex. C at 0000267).

55.   Experian "Admin Report," produced as a confidential document in this case, actually shows that Experian's file for Ms. Thach contains no less than 20 different name and SSN variations and 8 different addresses supposedly reported by Experian's customers regarding the same person, the Plaintiff.  (Attached as Exhibit 2, at EXPTHACH 23-39).

56.   Experian's Admin report, its internal credit history, also shows that its computer noted

under its "Fraud Shield" section, an internal conflict between the "current addresses" Experian received and was combining. *Id*.

57.    Based on the documents produced from Experian, the fraud alert appears to have been initiated as a result of another consumer reporting agency informing Experian of potential fraud on the account. *Id*. (stating "Letter Date= 10/27/2009 . . . Letter Paragraphs = Added initial alert per other CRA. . .")

58.    On October 27, 2009, Experian also recognized a second fraud alert for the Plaintiff's file. The October 27, 2009 correspondence was mailed to a different address, 7407 Barley Walk, Falls Church, VA 22042. (Exp.'s Mem. Supp. SJ, Ex. C at 0000263). The Barley Walk address was an entirely different address then the address used by Experian to mail the consumer disclosure on September 8, 2009, and should have been a red flag to Experian that there was an issue with its personal identifying information for the Plaintiff. (Exp.'s Mem. Supp. SJ, Ex. D at 0000245).

**C.    Ms. Thach Tries to Obtain a Mortgage.**

59.    Experian's internal (designated by Defendant as confidential) Admin Report shows that Experian furnished 11 different consumer reports to third parties between August 2012 and January 2014. *Id*. at EXPTHACH 32-33. Two of these were furnished to "Old Republic Credit" on behalf of "C and F Mortgage Corp." and to "Credco" on behalf of "Fidelity Lending Group", on August 13, 2012 and August 20, 2012, respectively. *Id*. at EXPTHACH 33.

60.    Ms. Thach is a single mother of two children, ages 12 and 11. In August 2012 and actually for the past seven years through today, Ms. Thach lives in her mother's apartment at 2926 Monticello Drive, Falls Church, Virginia, 22042. (*See* Pl.'s Answers to Experian's First Set of Interrogatories, Int. No. 1, attached as Exhibit 3). Ms. Thach wanted to obtain a mortgage loan so that she could buy a house for herself and her family because they currently reside with Ms. Thach's mother. (Ex. 3, Int. No. 24).

61.    When she applied for the loan, Plaintiff had already identified the house she wanted to

purchase, which was priced at $164,000. (Thach Dep. 51:15-19, Sept. 2, 2014) (attached to Def.'s Mem. Supp. PSJ, Ex. B). Plaintiff had diligently saved her money over the years; therefore, was able to make a substantial down payment in the amount of around $60,000. *Id*. at 51:18-19. Thus, Plaintiff only applied for a loan in the amount of $100,000, which was a modest loan based on her income of roughly $60,000-$70,000 per year as a hair stylist in Washington, D.C. *Id*.; *see also* Ex. 3, Int. No. 2.

62.     Plaintiff attempted to obtain a mortgage loan from several companies, including C&F Mortgage Corporation and McLean Mortgage Corporation. (*See* Pl.'s Mem. Supp. PSJ, Ex. B, Thach Decl. ¶ 9). Plaintiff was referred to C&F Mortgage by her friend, Hai Ho ("Mr. Ho"), who had a friend that worked at C&F Mortgage. (Thach Dep. 53:1-11). When Ms. Thach contacted C&F Mortgage, the broker requested her financial information, which she provided over the phone. *Id*. at 56:8-12. C&F Mortgage also requested Ms. Thach's permission to pull her credit report. *Id*. at 55:24-25, 56:2-4. After C&F Mortgage obtained her credit report, she was told that she would not qualify for a loan because her credit report contained more than a dozen derogatory credit accounts, including more than ten accounts reported by Experian. *Id*. at 53:8-17, 56-16:18.

63.     This information was inaccurate as Ms. Thach had always paid her bills on time and never had more than seven credit accounts – all of which were in good standing. (Pl.'s Mem. Supp. PSJ, Ex. B, Thach Decl. ¶¶ 6-8).

64.     Believing that this was a mistake, Plaintiff then applied with McLean Mortgage Corporation, but was told by Joe Lucas that she would never qualify for a loan based on the derogatory credit information in her credit file. (Thach Dep. 57:14-21). None of the derogatory accounts in these reports actually belonged to the Plaintiff. (Pl.'s Mem. Supp. PSJ, Ex. B, Thach Decl. ¶ 12).

65.     Experian's internal records show that it provided Plaintiff's credit report to First American Financial/Credco ("Credco") on August 20, 2012, and Old Republic Credit Service ("Credit Plus") on August 13, 2012, companies that resold a tri-merge credit report containing Experian credit report regarding Ms. Thach. (Exp.'s Mem. Supp. SJ, Ex. D at 0000283). The Credco and Credit Plus

credit reports accurately transcribed the account information Equifax had reported. Attached as Exhibits 4 and 5 are the Credco and Old Republic credit reports; Compare with Experian's Consumer Disclosure dated September 12, 2012 (Exp.'s Mem. Supp. SJ, Ex. D at 0000271-0000288).

66.     Not only were the accounts inaccurate, but they also contained overwhelming inconsistencies in identifying information which should have alerted Experian that there was inaccurate information within her credit file. *Id*. at ¶ 12. The Plaintiff, Thach Cham Thi Thach, has never used any other first name besides Thach, middle name besides Cham Thi, or last name besides Thach. (Ex. 3, Int. No. 1).

67.     In the Credco Report, Experian indicated the Plaintiff was also known by the following names: Phanh Cham Thach and Chai C. Thach. (Ex. 4, at Pl.'s Ex. #000018). Similarly, in the Old Republic Report obtained by C&F Mortgage, Experian indicated the Plaintiff was also known by the following names: Phamh Thach, Chai C. Thach and Thanh Tram Thach. (Ex. 5, at Pl.'s Ex. #001774).

68.     Similarly, in both reports obtained by Plaintiff's potential mortgage lenders, two of the three addresses provided by Experian were incorrect. (Ex. 4, at Pl.'s Ex. #000018; Ex. 5, at Pl.'s Ex. #001774). Plaintiff had never resided or received mail at either of those addresses. . (Pl.'s Mem. Supp. PSJ, Ex. B, Thach Decl.  ¶¶ 20-22). Further, Experian's own records identified a "current address conflict." (Attached as Exhibit 2, at EXPTHACH_0000024).

69.     Moreover, documents produced by Experian and the data furnishers in this case show that the accounts that are subject to this action were reported by the respective furnishers with information that was patently inconsistent with that already in the Plaintiff's Equifax credit file. (*See* Ex. 2).

70.     For example, Experian's Administrative Report reflects that it had 18 different name variations in Plaintiff's file, including many names that did not even closely resemble Plaintiff's, such as Thanh Phach, Thanh T. Phach, Phamh Thach, Chai C. Thach, and Trang T. Thach. (Ex. 2, at EXPTHACH_0000023). The Administrative Report further reflect 3 address variations that did not

belong to Plaintiff. *Id*. at EXPTHACH_0000024. The Administrative Report further reflect that Experian provided a copy of Ms. Thach's credit file to at least 15 potential creditors prior to January 29, 2013, when Plaintiff made her first dispute to Experian. (Ex. 2, at EXPTHACH_0000024). These inquiries included the reports obtained during Plaintiff's attempts to qualify for a mortgage. *Id*. at EXPTHACH_0000033.

71. Experian's statement of material facts omits any reference to the unrefuted expert report of Evan Hendricks ("Mr. Hendricks") in this case. Mr. Hendricks is one of the leading experts in the United States on credit reporting issues and has testified as an expert witness in at least 25 FCRA cases, including trials before this Court. (Hendricks Expert Report, July 28, 2014, at 32); *Robinson v. Equifax Info. Servs., LLC*, Case No. 1:05-cv-1272 (E.D. Va. 2005); *Sloane v. Equifax Info. Servs., LLC*, Case No. 1:06-cv-2044 (E.D. Va. 2006).

72. In his report, Mr. Hendricks opines that "Plaintiff's case had several telltale signs of mixed and/or multiple files." (Ex. 6, Hendricks Expert Report, July 28, 2014, at 1). Mr. Hendricks further opined that the "evidence thus far leads [] to the conclusion that Defendant CRAs mixed Plaintiff's mother's data into Plaintiff's file because there was 'a partial SSN match,' a 'partial name match," and an address match." *Id*. at 2.

73. Mr. Hendrick's also opines about the inadequacy of Experian's partial matching procedures despite its storied history of mixing consumer files, including government enforcement actions and private lawsuits. This history includes a Federal Trade Commission ("FTC") enforcement action against Experian [formerly TRW, Inc.] in the United States District Court for the Northern District of Texas. *FTC v. TRW, Inc*., 784 F. Supp. 361 (N.D. Texas 1991). In settling the enforcement action brought by the AGs, Experian agreed to maintain reasonable procedures to prevent the occurrence or reoccurrence of mixed files. Another enforcement action was brought against Experian by nineteen state attorneys general that resulted in a similar consent order as described in the previous paragraphs, including the procedures related to the prevention of mixed files and procedures to

reinvestigate disputes resulting from mixed files. *See TRW, Inc. v. Morales*, Civil Action No. 3-91-1340-H (N.D. Tex. 1991).

**D.   Plaintiff Disputes the Inaccurate Information Reported by Experian in Her Credit File.**

74.   Plaintiff mailed her first dispute letter to Experian on January 29, 2013. In her letter, Plaintiff explained that Experian was reporting more than a dozen accounts in her credit file that did not belong to her. (Exp.'s Mem. Supp. SJ, Decl. of Joseph W. Clark, Ex. C).

75.   In particular, Plaintiff wrote "I do not owe these debts. I was not aware that these accounts were reporting on my credit report until I applied for a mortgage. I did not open the above accounts, nor did I authorize another person to open them on my behalf. Based on the personal information in my report, it is possible you have confused me with another person with a similar name and/or identifying information." *Id.*

76.   Plaintiff further provided a handwriting exemplar and asked Experian to forward the handwriting exemplar to the creditors so that they could verify that the signatures on any applications did not belong to her. She also asked Experian to request from the creditors "a copy of the application or any other supporting documents to prove that [she] owe[d] these debts." *Id.*

77.   Plaintiff also provided her telephone number and requested Experian to call her if they needed any additional information that it may find helpful to resolve the dispute. *Id.*

78.   Plaintiff's letter was signed under oath and notarized. *Id.*

**E.   Experian Does Not Conduct A Meaningful Investigation Into Plaintiff's Disputes and Simply Parrots the Information It Receives from Its Furnishers.**

79.   The documents produced by Experian in this lawsuit confirm that Experian did nothing more to investigate Plaintiff's dispute than sending an ACDV and parroting the response from the furnishers, such as First Premier Bank. (Exp.'s Mem. Supp. SJ, Ex. F at 000020-000023).

80.   Despite the three-page letter from Plaintiff, the ACDVs sent by Experian to First Premier Bank simply stated "Belongs to another individual with same/similar name. Provide or confirm

complete ID (including Social Security Number, Date of Birth, Generation Code, etc.)." (Exp.'s Mem. Supp. SJ, Ex. F at 000020-000023).

81.    The ACDV did not provide Plaintiff's handwriting exemplar or indicate that Plaintiff claimed under oath that "she did not open the accounts, nor did [she] authorize another person to open them on [her] behalf." (Exp.'s Mem. Supp. SJ, Ex. F at 000020-000023).

82.    Moreover, the ACDV relating to the First Premier Account ending in 7736 indicated that Plaintiff had a previous name of "Chia Thach," which is Plaintiff's mother's name. (Exp.'s Mem. Supp. SJ, Ex. F at 000020).

83.    Plaintiff had never used the name Chia Thach. (Pl.'s Mem. Supp. SJ, Ex. B, ¶ 23).

84.    First Premier responded to the ACDVs in February 2013. (Exp.'s Mem. Supp. SJ, Ex. F at 000020-000023).

85.    In response to the First Premier Account ending in 7736, First Premier did not have an exact match of the information provided by Experian. Instead, First Premier reported back to Experian that Plaintiff's current address was "3181 Monticello Drive, Falls Church, VA, 22042." (Exp.'s Mem. Supp. SJ, Ex. F at 000020).

86.    Despite the differences in current address, Experian verified the account without requesting any additional information from First Premier.  (Exp.'s Mem. Supp. SJ, Ex. F at 000020).

87.    Neither Experian nor First Premier have produced any documents in this case showing that Experian sent an ACDV for the other disputed First Premier account (ending in 5587) in response to Plaintiff's January 29, 2013 dispute letter. (Exp.'s Mem. Supp. SJ, Ex. F at 000020).

88.    Thus, there is absolutely no evidence in the record that Experian conducted an investigation into the accuracy of the First Premier account (ending in 5587) after Plaintiff's first dispute.

89.    After receiving correspondence from Experian indicating that the First Premier accounts belonged to her, Plaintiff sent another letter to Experian on June 3, 2013, that once again disputed that

these accounts belonged to her. (Exp.'s Mem. Supp. SJ, Ex. C at 000011).

90.     On June 20, 2013, Experian sent an ACDV to First Premier Bank regarding the account ending in 5587. (Exp.'s Mem. Supp. SJ, Ex. F at 000006).

91.     Despite Plaintiff's detailed letter once again disputing ownership of the accounts, Experian's ACDV merely stated "Not his/hers. Provide or confirm complete ID." (Exp.'s Mem. Supp. SJ, Ex. F at 000006).

92.     In response to the First Premier Account ending in 5587, First Premier did not have an exact match of the information provided by Experian. Instead, First Premier reported back to Experian that Plaintiff's current address was "3181 Monticello Drive, Falls Church, VA, 22042." (Exp.'s Mem. Supp. SJ, Ex. F at 000006).

93.     Experian also an ACDV to First Premier on June 25, 2013, regarding the account ending in 7736. (Exp.'s Mem. Supp. SJ, Ex. F at 000012).

94.     In response to the First Premier Account ending in 7736, First Premier did not have an exact match of the information provided by Experian. Instead, First Premier was now reporting back to Experian that Plaintiff's current address was "7407 Barley Walk, Falls Church, VA." (Exp.'s Mem. Supp. SJ, Ex. F at 000012).

95.     First Premier's address was inconsistent with the address provided by Plaintiff and with its first ACDV response that indicated that Plaintiff's current address was "3181 Monticello Drive, Falls Church, VA, 22042." (*See* Exp.'s Mem. Supp. SJ, Ex. F at 000020; Compare with Exp.'s Mem. Supp. SJ, Ex. F at 000012).

96.     Moreover, if Experian would have asked for any of the underlying documents as requested by Plaintiff (and as it subsequently did in this litigation), it would have revealed that all statements on the account were mailed to 3181 Monticello Drive, Falls Church, VA, 22042—an address that Plaintiff never resided at. (*See* Pl.'s Mem. Supp. PSJ, Exs. I and B, ¶¶ 21-22).

97.     The underlying documents would have also shown that all record of payments on the

account were made by checks in the name of "Thach Thi My Trang," who resided at 3181 Monticello Drive, Falls Church, VA, 22042 according to the checks. (*See* Pl.'s Mem. Supp. SJ, Ex. J).

**F.      Experian's Outsourced Investigation Procedures Do Not Allow For a Meaningful and Searching Inquiry into Consumer Disputes.**

98.      As explained by Mr. Hendricks, Experian relies on the ACDV exchange as the principal means of reinvestigating a consumer's dispute. (Ex. 6, Hendricks Expert Report at 4).

99.      The ACDV exchange is a process by which a "CRA populates the ACDV form with [the consumer's] identifying information (name, address, city-state-zip, SSN, sometimes previous address), and a two-or three-digit, or alpha-numeric code that cryptically describes the dispute (e.g., "not mine" or "fraud")." *Id.*

100.      Upon receipt of the ACDV form from Experian, Mr. Hendricks explains that  "all a furnisher does is advise Experian if a sufficient number of identifiers (i.e., name, social security number) match up and then 'instruct' [Experian] to either delete, modify, or 'verify' the information that remains." *Id.*

101.      Thus, Mr. Hendricks concludes that "this process is better described as a comparison of each entity's existing data on the consumer, rather than an independent evaluation or investigation of the consumer's dispute." *Id.*

102.      The documents produced by Experian and First Premier reflect that this is precisely what occurred in this case and that no other communications occurred between the companies. (Exp.'s Mem. Supp. SJ, Ex. F at 000001-000025).

103.      One of the many problems with the ACDV process is that Experian outsources its ACDV processing to Santiago, Chile, and ████████████████████████████ ███████████ as confirmed by the deposition of Pamela Carolina Aravena Tapia, an employee in Experian's Santiago office. (Tapia Dep. 17:6-23, Aug. 16, 2013, attached as Exhibit 7).[1]

---

[1] Pursuant to Experian's designation of Ms testimony as confidential, Plaintiff has redacted portions of this memorandum in order to give Experian time to file its motion to seal.

104.    Gerald Ochoa ("Mr. Ochoa"), another employee of Experian who manages the Santiago office, also confirmed ███████████████████████████████████████████████████████ ██████. (Ochoa Dep. 24:16-20, Feb. 6, 2014, attached as Exhibit 8).

105.    Mr. Ochoa further confirmed that ████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ██████. (Ex. 8, Ochoa Dep. 60:15-22).

106.    Another problem with Experian's investigation procedures is that an ACDV operator ██ ████████████████████████████████████████████████████████████████████████ ██████. (Ex. 7, Tapia Dep. 69:19-21; 70:1-4).

107.    This means that an ACDV operator ████████████████████████████████ ████████████████████████████████████████████████████████████████. *Id.* at 72:1-8.

108.    Moreover, Experian employees ████████████████████████████████████ ██████. *Id*. at 70:16-20.

109.    As noted by Mr. Hendricks, this "hurried, conveyor-belt styled atmosphere is conducive to a dispute operator overlooking, missing or just 'whiffing' on any given dispute due to volume, speed or attention issues." (Ex. 6, Hendricks Expert Report at 5).

110.    This likely resulted in Experian failing "to indicate the status of 9 of the accounts disputed in Plaintiff's January 2013 dispute letter." *Id*.

111.    In addition, Experian typically relies "entirely on the response of furnisher, who through their 'instructions,' effectively dictate to [Experian] what will be the outcome of [Experian's] investigations. This is true even through furnishers, like the ones in this case, at most, typically only glance at the records system from which they furnished the inaccurate information in the first place." *Id*.

112.    Mr. Hendricks opines that this process of "parroting" the information in favor of the furnisher reflects disregard for the FCRA's goals of fairness and impartiality. *Id*. at 6.

G.      **Plaintiff's Damages.**

113.    Plaintiff was unable to qualify for a modest $100,000 loan in August 2012 due to the inaccurate information published by Experian. (See, e.g., Ex. 3, Int. 21). Plaintiff's long-time friend, Hai Ho ("Mr. Ho"), had referred her to a mortgage loan officer. After Plaintiff applied for the mortgage, she came to Mr. Ho in tears after she was told that she would not qualify for a loan due to the derogatory information on her credit reports. (Ho Decl. ¶¶ 7-9, attached as Exhibit 9). (Exp.'s Mem. Supp. SJ, Ex. B, Thach Dep. Tr. at 54-58).  Each of the derogatory accounts reported by Experian did not belong to the Plaintiff, who only ever had seven accounts—all which were positive. (*See* Pl.'s Mem. Supp. PSJ, Ex. B, Thach Decl. ¶¶ 6-8, 13-14, 16).

114.    Plaintiff has also withdrawn herself from the credit market at out fear and embarrassment that she will be again humiliated when her credit report is viewed by a new prospective creditor and she again will have to try to convince her creditor that the derogatory information in her account does not belong to her. (Ex. 3, Int. No. 21).

115.    Plaintiff's damages also includes the considerable time, effort and expense (including postage) she has been forced to expend attempting to force the Defendant to comply with its statutory obligations. *Id.*  Plaintiff has estimated the total time spent in her attempts to resolve these disputes to be in excess of 13 hours at the time she answered the Interrogatories. *Id.* The Plaintiff earned roughly $30 per hour. *Id.*  The estimate of time lost as a dollar impact is thus $390. *Id.*

116.    The injury to Ms. Thach was not merely her loss of credit opportunities, but as well the substantial embarrassment, fear, worry and inescapable stress she felt at each stage of her effort to clear her good name.  For example, in her deposition, Plaintiff explained that she felt humiliated in front of Mr. Ho after she could not qualify for the mortgage loan and had to explain that her credit report did not accurately reflect her own good name.  Thach Dep. 89:3-9.  Plaintiff had always maintained a good payment history. (*See* Pl.'s Mem. Supp. PSJ, Ex. B, Thach Decl.  ¶ 6-7).   She valued her credit and paid her bills. *Id*. When she was told by the mortgage lenders that she was not able to qualify for any

mortgage loan, it was devastating because it was an attack on Ms. Thach's own self-esteem and image. (*See* Exhibit 3, Int. No. 21; Ex. 9, Ho Decl. ¶¶ 19-20). At her deposition, Plaintiff testified that she felt trapped and like she couldn't speak with anyone about the credit issues because she was concerned that people would think less of her due to her inability to obtain credit or a home for her family. Thach Dep. 89:3-9. Ms. Thach further testified that she felt ashamed that she could not provide a home for her kids and that she is ashamed that her kids are still struck in a small apartment with her mother – where she must share a room with her near teenage daughter— despite her painstaking effort to save her money. *Id.* at 90:4-11; 42:15-25   Mr. Ho also testified that he observed visible anxiety, stress, anger, and frustration experienced by Ms. Thach, who he described as previously happy and carefree during previous ten years that he has known her. (Ex. 9, Ho. Decl. ¶¶  5, 16).   However, after she couldn't qualify for the loan and get the problem fixed, Mr. Ho noticed Ms. Thach becoming more and more angry and upset. *Id.* at ¶ 11-16.  Mr. Ho also testified that he observed Plaintiff lose weight because of the worry and that her eyes appeared more dark because she was not getting as much sleep due to her anxiety over her credit reporting problems. *Id.* at ¶ 17.  Mr. Ho further testified that he observed Plaintiff's self worth lower as a result of the ongoing problems with her credit report and because she feels like she has failed her family because she cannot get credit like everyone else. *Id.* at ¶¶ 18-20.  Ms. Thach explained that she has felt powerless to correct the situation because of her multiple attempts to get the problem fixed. (*See* Ex. 3, Int. No. 21).

### III.  A REASONABLE JURY COULD FIND THAT EXPERIAN VIOLATED THE FCRA.

#### A.      A Reasonable Jury Could Find that Experian Violated 15 U.S.C. § 1681e(b).

As this Court has held in a comparable Experian case[2], "In recognition of the critical role that [consumer reporting agencies] play in the credit markets and the serious consequences borne by consumers because of inaccurate information disseminated in consumer credit reports prepared by

---

[2] Both Defendants have substantial experience in this District and Circuit. Nevertheless, they largely fail to discuss, consider, distinguish or even mention this uniform chain of jurisprudence because it is largely at odds with the contentions in these motions.

CRAs, Congress placed on a CRA what can only be described as very high legal duties of care[.]" *Burke v. Experian Info. Solutions, Inc.*, 1:10-CV-1064 AJT/TRJ, 2011 WL 1085874 (E.D. Va. Mar. 18, 2011). The Fourth Circuit has cautioned: *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 416 (4th Cir. 2001); *See also Burke*, 2011 WL 1085874 ("Given the fact intensive nature of these inquiries, "[t]he issue of whether the agency failed to follow 'reasonable procedures' will be a 'jury question[ ] in the overwhelming majority of cases.' " *Dalton,* 257 F.3d at 416, quoting *Guimond v. Trans Union Credit Info. Co.,* 45 F.3d 1329, 1333 (9th Cir.1995).")The FCRA obligates CRAs to follow "reasonable procedures to assure maximum possible accuracy" in their credit reporting. 15 U.S.C. § 1681e(b). "[A] consumer reporting agency violates § 1681e(b) if (1) the consumer report contains inaccurate information and (2) the reporting agency did not follow reasonable procedures to assure maximum possible accuracy." *Dalton v. Capital Associated Indus., Inc*., 257 F.3d 409, 415 (4th Cir. 2001).

It is undisputable that Experian furnished inaccurate credit reports about her. Defendant's own records show that it made no less than 16 third party reports to Plaintiff's potential creditors from April 2011 through March 2013, including when Plaintiff applied for a mortgage. (Exp.'s Mem. Supp. SJ, Ex. D, at EXPTHACH_0000298-0000299). And even in this litigation, Experian continued to report at least one inaccurate account as belonging to Ms. Thach. Experian's assertion that it does not see a material inaccuracy is really simply its statement of a flawed corporate philosophy that "accuracy" means reporting exactly what its customer/furnishers tell it to report.

"Reasonable procedures are those that a reasonably prudent person would [undertake] under the circumstances." *Schweitzer v. Equifax Info. Solutions LLC*, 441 F. App'x 896, 903 (3d Cir. 2011) (internal quotations and citations omitted). This Court has explained that a CRA's duty under § 1681e(b), though less rigorous than under the dispute provision, § 1681i(a), still entails a requirement that the CRA have conducted n "investigation" to determine if the information it is to report is maximally accurate. In rejecting the same arguments from Experian that it makes in this case, this Court explained that the text of the statute and the obvious meaning of its terms demands that the CRA

16

include within its "reasonable procedures" an initial examination and investigation to ensure the maximum possible accuracy of its reporting. *Burke*, 2011 WL 1085874. ("It is difficult to imagine how 'maximum possible accuracy' could be guaranteed without an adequate investigation. Likewise, Section 1681i(a)(1)(A) requires a 'reinvestigation,' necessarily implying that an "investigation" was required to have been performed in the first instance.")

In this case, there is literally zero evidence that Experian has ever vetted the specific subscribers –most "bottom feeder" debt buyers – to determine whether they maintained accurate records, to understand where the furnisher actually obtained the identifying information they later reported back to Defendant, to determine if they substantively investigated consumer disputes or anything else to support a belief that these specific furnishers were presumptively reliable.  In fact, Experian has not even found or produced a contract, subscriber agreement or even a piece of paper to support its claimed relationship with the furnishers in this case. The furnishers in this case were entire strangers to Defendant.

Rather than simply wonder what if any basis Experian had to determine these various subscriber furnishers "reliable", the Court must in fact permit the inference that if there were evidence of such reliability, Experian would have produced it.  *Norfolk & W. Ry. Co. v. Transp. Commc'ns Int'l Union*, 17 F.3d 696, 702 (4th Cir. 1994)(holding that "[t]he drawing of an adverse inference against a party who fails to come forward with relevant evidence within its control is a reasonable and well-recognized evidentiary rule.")(citations omitted); *accord Scott v. Watsontwon Trucking Co., Inc*., 533 Fed. Appx. 259, 261 (4th Cir. 2013) (unpublished) (applying Virginia law, but nonetheless finding generally that it is a proper instruction that a jury may infer the unexplained failure to call an important witness means that the testimony would be unfavorable to the party who failed to produce the witness).  Experian omission of any witness, subscriber agreement, copy of communication from a prospective furnisher or otherwise properly allows the inference that the production of such evidence would have been adverse to Experian's very point.

In this case, Experian does not understand the Plaintiff's claim under §1681e(b). Its entire motion is limited to just the First Premier Bank account that remained in Ms. Thach's file into litigation and after the Plaintiff's disputes. Certainly that account was inaccurately reported as the Plaintiff's. But Ms. Thach's §1681e(b) claim starts much earlier than the late date in which only the First Premier account remained. As early as 2009, Experian began the mixed reporting of numerous accounts that did not have matching full names, SSNs or addresses. As had Equifax prior to the Plaintiff's first dispute in September 2012, Experian received constant and enormous red flags to place it on notice that its reporting and merger of these various inaccurate accounts with the Plaintiff's credit file was – at a minimum – not reasonably prudent to ensure maximum possible accuracy. For example, in 2009, it also received a Fraud Alert warning, added to Experian's actual file. (Exp.'s Mem. Supp. SJ, Ex. C at 0000263 and 0000267). Rather than accept this as its own caution, Defendant ignored such notice, deferring its use entirely to its furnisher customers. Then, despite uninterrupted reporting of the same full name, same SSN, same date of birth and same address from at least 2009, Experian began combining a wide assortment of identities with Ms. Thach's credit file – at least 20 different name and SSN variations and 8 addresses. Experian had also received 2 fraud alerts and its own file system noted that there was a "current address conflict" because Experian was trying to mix accounts contemporaneously reporting two inconsistent current addresses.

This reporting was logically inconsistent. Certainly a jury could find that at a minimum these inconsistencies should have placed Experian on notice that something out of the ordinary existed in this file. In addition to the *a priori* obligation to vet and consider the accuracy and reliability of data when first reported, a CRA must also be aware of patterns or indicia of suspect reliability of its reported data. 16 C.F.R. Part 600 FTC Commentary Appendix 607 (3)(A). ("[W]hen a consumer reporting agency learns or should reasonably be aware of errors in its reports that may indicate systematic problems (by virtue of information from consumers, report users, from periodic review of its reporting system, or otherwise) it must review its procedures for assuring accuracy.") As the FTC has cautioned Experian,

"A CRA must accurately transcribe, store and communicate consumer information received from a source that it reasonably believes to be reputable, in a manner that is logical on its face. ... Similarly, it should establish procedures to avoid reporting information from its furnishers that appears implausible or inconsistent. … A CRA must maintain procedures to avoid reporting information with obvious logical inconsistencies." *See* "40 Years of Experience with the Fair Credit Reporting Act, an FTC Staff Report with Summary Interpretations," at 67-68, 81 (2011).[3]

The evidence strongly supports a finding that Experian's procedures were unreasonable and imprudent to ensure maximum possible accuracy.  Nevertheless, to prevail on Defendant's motion, Ms. Thach must only show that there is a question of fact as to such reasonableness.   As the Fourth Circuit found in *Dalton v. Capital Associated Indus., Inc.*, "This case is easily grouped within the 'overwhelming majority of cases'" in which "[t]he issue of whether the agency failed to follow 'reasonable procedures' will be a 'jury question.'" 257 F.3d at 416.

### B.      A Reasonable Jury Could Find that Experian Violated 15 U.S.C. § 1681i(a).

Plaintiff will also establish that Equifax violated FCRA § 1681i(a) by its failure to conduct the rigorous reinvestigation required upon receiving the Plaintiff's disputes, to consider the relevant information Ms. Thach provided it with those disputes or to otherwise forward her relevant information in it to its customer/furnishers.  With the superfluous text removed, 15 U.S.C. §1681i(a) imposes the following duties all of which Experian violated:

1   If the completeness or accuracy of any item of information contained in a consumer's file is disputed by the consumer directly, the agency shall conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file. §1681i(a)(2)(A).

2   The notice [that the CRA provides to the creditor/furnisher after receiving the consumer's dispute] shall include all relevant information regarding the dispute that the agency has received from the consumer.  §1681i(a)(2)(A).

3   The consumer reporting agency shall review and consider all relevant information submitted by the consumer. §1681i(a)(4).

---

[3]   http://www.ftc.gov/sites/default/files/documents/reports/40-years-experience-fair-credit-reporting-act-ftc-staff-report-summary-interpretations/110720fcrareport.pdf.

> 4   [The CRA must immediately remove disputed information if it determines that] the
> information that is the subject of the reinvestigation is […] inaccurate or incomplete
> or […] cannot be verified.  §§1681i(a)(2)(C) and 1681i(a)(5).

As to the first and most important of these requirements, the word "reinvestigation" must be understood by its ordinary meaning – a rigorous searching inquiry.  As the Fourth Circuit explained in *Johnson v. MBNA*,

> The key term at issue here, "investigation," is defined as "[a] detailed inquiry or systematic examination."  Am. Heritage Dictionary 920 (4th ed.2000); see Webster's Third New Int'l Dictionary 1189 (1981) (defining "investigation" as "a searching inquiry").

357 F.3d 426, 430 (4th Cir. 2004).[4]  This Court has confirmed that this definition applies equally in force for the "reinvestigation" under § 1681i(a) required of a CRA such as Equifax.  *Mullins v. Equifax Info. Servs., LLC*, CIV. 3:05CV888, 2007 WL 2471080 (E.D. Va. Aug. 27, 2007) ("In instruction 18, the Court gave 'reinvestigation' a similar definition as 'investigation.' TU objects that this contradicts decisional law because the Fourth Circuit in *Johnson v. MBNA* recognized that 'creditors and credit reporting agencies have different roles in investigating consumer disputes under the FCRA.' 357 F.3d 426, 432 (4th Cir.2004). The Court rejected that argument at the instructions hearing (Trial Tr. at 512:13-19), and TU gives it no reason here to reconsider that decision here.").

More recently, this Court also rejected exactly the arguments when they were then made by Experian in 2011.  *Burke v. Experian Info. Solutions, Inc.*, 1:10-CV-1064 AJT/TRJ, 2011 WL 1085874 (E.D. Va. Mar. 18, 2011) (applying *Johnson* "investigation" standard to CRA's "reinvestigation" duty.)[5]  Thus, when Experian received the Plaintiff's several disputes, it was required to conduct "[a] detailed inquiry or systematic examination" to determine or ensure that its attribution of the challenges accounts to the Plaintiff was correct.   It plainly did not do so.

---

[4] This Court also similarly held as much even before the Fourth Circuit affirmed Judge Williams' decision.  *Ayers v. Equifax Info. Servs.*, 2003 WL 23142201 (E.D. Va. Dec. 16, 2003).

[5] The "reinvestigation" duty of a CRA such as Experianis a fact-driven balancing test that weighs the burden of conducting a more substantive investigation against the possible harm to the affected consumer.  …a 'balancing test' that weighs the cost of verifying the accuracy of the information versus the possible harm of reporting inaccurate information, and this test becomes markedly more favorable to plaintiff's who have disputed the accuracy of the information in their credit reports."  *Burke*, 2011 WL 1085874 (E.D. Va. Mar. 18, 2011) citing "*Johnson,* 357 F.3d at 432–33, citing with approval *Cushman v. Trans Union Corp.,* 115 F .3d 220, 225 (3d Cir.1997)".

In *Burke*, this Court cited the Third Circuit's seminal decision, *Cushman v. Trans Union*, 115 F.3d at 225 (3rd Cir. 1997).  This is without question the leading case defining a CRA's FCRA duties under 15 U.S.C. §1681i.  It is cited by nearly every Court applying §1681i and stands for the proposition that a §1681i(a) reinvestigation requires more than merely "parroting" the creditor/furnisher.  In fact, it was cited by the Fourth Circuit in its "what is a FCRA investigation" case, *Johnson v. MBNA America Bank, NA*, 357 F.3d 426, 432 (4th Cir. 2004).  Contrary to Defendant's bare assertions, §1681i does require more that merely "parroting" the creditor's response.  *Cushman*, 115 F.3d at 225. ("The 'grave responsibilit[y]' imposed by ' 1681i(a) must consist of something more than merely parroting information received from other sources. Therefore, a "reinvestigation" that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute.").

This Court has had multiple opportunities to consider and reject the CRA argument that an automated dispute (ACDV) system that merely accepts whatever the CRA customer/furnisher tells it to accept is lawful. For example, in a §1681i(a) jury trial that took place in this courthouse, Judge Payne instructed the jury:

> In assessing the issue of notice to Trans Union, you are instructed that, on several occasions since 1997, decisions of federal courts have informed… that the Fair Credit Reporting Act's Requirement for a reasonable reinvestigation must consist of something more than simply the parroting of information received from other sources and/or that a credit reporting agency does not act reasonably by deferring entirely to another source of information, such as a creditor.

Attached as Exhibit 10 is the jury instructions from *Mullins v. Equifax Info. Servs.*, LLC, CIV. 3:05CV888 (E.D. Va. Aug. 27, 2007). Co-Defendnat Equifax made and lost exactly the same arguments multiple times before this Court in the Alexandria Division, with significant jury verdicts upheld by the Fourth Circuit.[6]   And more recently, Experian advanced the same discredited "ACDV" refrain Court with a predictable result:

---

[6] *Sloane v. Equifax Info. Servs., LLC*, 510 F.3d 495, 500 (4th Cir. 2007);*Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 237 (4th Cir. 2009)

> Experian seeks summary judgment based on the proposition that by sending the ACDV to Litton, without more, it discharged its duty of reinvestigation as a matter of law. …Given the purpose for which a reinvestigation was required, a fact finder could conclude that Experian had failed to conduct a reasonable investigation "to assure maximum possible accuracy" in Burke's credit report. Experian knew virtually nothing about that dispute, other than it existed; and Experian's use of an ACDV request to Litton did little to focus Litton on the nature of the dispute. In his March 15, 2010, letter to Experian, Burke plainly offered to provide additional information about the dispute when he stated, "If you require any additional information from me related to this dispute, please contact me" and provided his telephone number.

*Burke*, 2011 WL 1085874 (E.D. Va. Mar. 18, 2011).  Plaintiff's dispute letters in this case similarly provided such detail, and similarly asked Experian to contact her for more information if needed.

The Plaintiff made several detailed disputes – in writing.  She provided handwriting samples. She explained the substance of the problem.  She made her dispute under oath and penalty of perjury. She provided her direct contact details, her government identification and her phone bill showing her verified address.  And still, Experian did absolutely no investigation.  The best that it did was to have its overseas agents reduce Ms. Thach's detailed letters into two digit codes for automated processing. Experian ignored that in September/October 2012, multiple of its furnishers immediately confirmed that Defendant's previous reporting was inaccurate.   It had no procedure in place to reconcile the numerous conflicts returned in the dispute responses for reported identifiers – addresses, first and middle names and lack of SSNs.  Instead, if a creditor did not expressly instruct Experian to delete, the Defendant deferred entirely to the automated command of its customer/furnishers and continued to report the account as belonging to Ms. Thach.

Even beyond the decisions in this District and Circuit, Experian has had actual notice from numerous other courts that its blind ACDV "parroting" was unlawful.   For example, in reversing the district court's grant of summary judgment for Experian in a §1681i(a) case, the Ninth Circuit also granted summary judgment against Experian *sue sponte*, concluding,

> This case illustrates how important it is for Experian, a company that traffics in the reputations of ordinary people, to train its employees to understand the legal significance

of the documents they rely on. *See generally* Rudy Kleysteuber, Note, Tenant Screening Thirty Years Later: A Statutory Proposal To Protect Public Records, 116 Yale L.J. 1344, 1356–64 (2007). Because Experian negligently failed to conduct a reasonable reinvestigation, we grant summary judgment to Dennis on this claim. We remand only so that the district court may calculate damages and award attorney's fees.

*Dennis v. BEH–1, LLC,* 520 F.3d 1066, 1071 (9th Cir.2008). Other courts have been equally clear in cautioning Experian as to its FCRA misconduct. In rejecting the exact same arguments Experian makes in this case, a sister court explained:

> Two federal circuits have held, however, that the reinvestigation required by section 1681 i(a) demands more than (a) forwarding the dispute information onto the furnisher of information and (b) relying on the furnisher of information's response. *See Cushman v. TransUnion Corp.,* 115 F.3d 220, 225 (3rd Cir.1997) (holding that "in order to fulfill its obligation under section 1681 i(a) 'a credit reporting agency may be required, in certain circumstances, to verify the accuracy of its initial source of information.' " (quoting *Henson v. CSC Credit Servs.,* 29 F.3d 280, 287 (7th Cir.1994)); *see also Stevenson v. TRW Inc.,* 987 F.2d 288, 293 (5th Cir.1993) ("In a reinvestigation of the accuracy of credit reports [pursuant to § 1681i(a) ], a credit bureau must bear some responsibility for evaluating the accuracy of information obtained from subscribers."). The court in *Cushman* noted that to only require the credit reporting agency to go to the furnisher of information would replicate the requirements of section 1681e(b), and such a reading would render the two sections largely duplicative of each other. *Id.* Receiving notification of a dispute from a customer shifts the responsibility of reinvestigation onto the credit reporting agency, and the statutory responsibility imposed on the credit report agency "must consist of something more than merely parroting information received from other sources." *Id.*

*Gorman v. Experian Info. Solutions, Inc.*, 07 CV 1846 (RPP), 2008 WL 4934047 (S.D.N.Y. Nov. 19, 2008). And Experian was similarly told, "'the case law is clear that a reporting agency does not act reasonably under the FCRA by deferring entirely to another source of information. The grave responsibility imposed by [the FCRA] must consist of something more than merely parroting information received from other sources.'" *Centuori v. Experian Info. Solutions, Inc.,* 431 F.Supp.2d 1002, 1008 (D.Ariz.2006) (citing *Cushman v. Trans Union Corp.,* 115 F.3d 220, 225 (3rd Cir.1997)).

CRAs have even been criticized for comparable reliance on partial matching procedures and parroting ACDV system in fact patterns exactly like that *sub judice*. *Moore v. Equifax Info. Servs. LLC*, 333 F. Supp. 2d 1360, 1365 (N.D. Ga. 2004)(" Equifax did seek verification of the report from Marlin, and Marlin did indicate that the information had been 'verified as reported.' However, the

23

evidence shows that under Equifax's procedures, if the furnisher of the information verified any two of the items of information listed on the verification form—"Name/Gen Code," "Address," "Prev Name/Prev Gen Code," "Prev Address," "SSN/DOB," and "Telephone Number"—then Equifax would accept the verification as a "complete ID" and would retain the report in the individual's credit file. … This evidence creates a genuine issue for trial as to whether Equifax fulfilled its duty to reinvestigate disputed information and delete such information if it was inaccurate or could not be verified… [A] credit reporting agency does not conduct a reasonable investigation by deferring entirely to another source of information."). And a CRA's retreat to partial matching rules as somehow legally tolerable has also been rejected when the CRA has notice of a possible failure in those procedures. *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230-32 (D.N.M. 2006)("In deciding similar claims, courts have reasoned that such "exclusive reliance" on furnishers of credit information and standardized procedures such as partial matching logic 'may not be justified once the credit reporting agency receives notice that the consumer disputes information contained in his [or her] credit report.' ... In such situations, "[i]t would make little sense to conclude that, in creating a system intended to give consumers a means to dispute—and, ultimately, correct—inaccurate information on their credit reports, Congress used the term 'investigation' to include [only] superficial ... inquiries by creditors" that "do not look beyond the [automated] information" in their own computer systems and "never consult underlying documents such as account applications" and the like. *Johnson,* 357 F.3d at 430–31.")

A reasonable jury could more than find that Experian violated § 1681i(a)(2) and (a)(4) in failing to substantively investigate Ms. Thach's disputes, failing to consider the relevant information she provided and failing to forward her disputes and information to the creditor/furnishers. And Experian concedes that it violated §1681i(a)(2)(A) by refusing to forward the Plaintiff's dispute and "all relevant information" to its furnishers instead of (or at least in addition to) the 2 digit ACDV code. But a jury could also find that Experian violated the related provisions accompanying its reinvestigation duty. Contrary to Defendant's claim, it did violation § 1681i(a)(5) by failing to delete and correct information

"found to be inaccurate or incomplete or [that] cannot be verified." 15 U.S.C. § 1681i(a)(5). Experian's own willful blindness to the incompleteness of its "investigation" results is amazing. None or close to none of its furnishers came back reporting a complete match to the Plaintiff's identifiers. And still it reported them as belonging to Ms. Thach.

Accordingly, a jury could find that Experian also violated § 1681i(a)(6). Summary Judgment as to §1681i(a) should be denied.

## IV.   A REASONABLE JURY COULD FIND ACTUAL DAMAGES.

The correct posture to consider the more item-by-item, damage element by damage element arguments Defendant proffers is to the jury.   Provided the Plaintiff can establish **some** measure of damage, she has satisfied her burden at this posture and the damages case should proceed to trial.

Experian asserts that the Plaintiff has not suffered any "actual damages" at its hands.   It imagines only two such proofs – "the denial of a home mortgage" in 2012 and *Doe v. Chao* proof of emotional distress. Plaintiff satisfies both of these defense obstacles – and certainly a jury could find as much.  But as well, Ms. Thach's injuries are much broader and the burden faced by a Plaintiff in a Fair Credit Reporting Act case is a much lower threshold.[7]

**Economic injury**.   Plaintiff can establish three elements of her economic injury derived from the derogatory credit with which she was inaccurately saddled.  In is undisputed that the Plaintiff approached multiple mortgage brokers in August 2012 in her attempt to apply for a loan and buy a home.   Further, both her Equifax and Experian reports contained the same derogatory and inaccurate history and each contributed equally to her inability to proceed with the loan process.

Accordingly, traditional tort causation principles have been remedially applied to the FCRA. The principle case on point is the Third Circuit's decision in *Philbin v. Trans Union Corp.*, 101 F.3d 957

---

[7] Experian also inserts a short statute of limitations argument contending that the FCRA's two-year limitation ran from the point where Experian first furnished inaccurate information.  This ignores the fact that the cause of action that accrues is each new furnishing of each new credit report or each new dispute.  *Broccuto v. Experian Info. Solutions, Inc.*, CIV.A. 3:07CV782HEH, 2008 WL 1969222 (E.D. Va. May 6, 2008).

(3d Cir. 1996), cited by multiple circuits, including ours.  In a FCRA case in which the CRA challenged the consumer's credit damage claim contending that there could be other factors to explain the adverse decisions, the Third Circuit rejected such challenges and permitted proof of the credit denials by circumstantial evidence and inference:

> More fundamentally, the district court erred by assuming that Philbin could satisfy his burden only by introducing direct evidence that consideration of the inaccurate entry was crucial to the decision to deny credit. While Philbin's case might have been stronger had he deposed or taken affidavits of those responsible for the decision, such evidence is not essential to make out a prima facie case pursuant to  § 1681e(b). We deem it sufficient that, as with most other tort actions, a FCRA plaintiff produce evidence from which a reasonable trier of fact could infer that the inaccurate entry was a "substantial factor" that brought about the denial of credit.

*Philbin v. Trans Union Corp.*, 101 F.3d 957, 968 (3d Cir. 1996).  This "substantial factor" language has become established law.

In practice, the "substantial factor" analysis and the permitted use of circumstantial evidence to establish credit injury makes sense.  A jury is permitted to draw reasonable inferences and accept the impact of an inaccurate credit report as a relevant and substantial factor in a lender's denial decision. *See Sloane v. Equifax Info. Servs., LLC*, 510 F.3d 495, 501 (4th Cir. 2007) (Equifax next argues that the evidence does not support any award for economic losses. Equifax claims that only speculation and conjecture support such an award … We disagree. The evidence at trial in this case clearly demonstrates that on numerous occasions Suzanne attempted to secure lines of credit from a variety of financial institutions, only to be either denied outright or offered credit on less advantageous terms that she might have received absent Equifax's improper conduct. At times, these financial institutions consulted credit reports from other agencies, but at other times these institutions relied exclusively on the erroneous credit information provided by Equifax. Based on these incidents, we find that there is a legally sufficient evidentiary basis for a reasonable jury to have found that Equifax's conduct resulted in economic losses for Suzanne."); *Lendino v. Trans Union Credit Info. Co.*, 970 F.2d 1110, 1112-13 (2d Cir. 1992) (permitting a reasonable inference that adverse information in a credit report caused a credit denial); *Alley v. First Am. Credco, Inc.*, No. 05CV2130, 2007 WL 188036, at *5 (N.D. Ill. Jan. 19,

2007) ("Although [the mortgage broker] also testified that he did not personally know why Alley's loan was denied. Nevertheless, material issues of fact remain. Specifically, CREDCO concedes that the Shell Management account was the only delinquency on Alley's credit report"); *Koropoulos v. Credit Bureau, Inc.,* 274 F.2d 37 (D.C.Cir.1984), (the plaintiff presented a material question of fact as to whether "the only reasonable interpretation" was that this was the reason for the denial."); *Bach v. First Union Nat. Bank*, 149 F. Appx. 354, 361 (6th Cir. 2005) ("FUNB also argues that the district court erred in relying on Bach's rejected credit card application in finding that Bach had proved actual damages resulting from FUNB's FCRA violation. FUNB asserts that the credit report on which Bank One relied in rejecting Bach's application did not include the false FUNB information from Bach's file and says this false information had already been deleted. However, … Viewing this evidence in the light most favorable to Bach, the district court did not err in finding that sufficient evidence was presented from which a jury could reasonably conclude that a causal link existed between the rejected credit card application and FUNB's FCRA violation.")     The evidence presented by Ms. Thach and available for trial is that Experian furnished its credit reporting regarding Plaintiff to C & F Mortgage and to Credco, for Fidelity Mortgage. And that Experian's file at that time contained close to two dozen major derogatory items, none of these belonging to the Plaintiff. Further, it is undisputed that the Plaintiff tried to start an application process to apply for a mortgage loan, and that she was three times sent away because her credit report was horrific. Experian argues that – it could have been another cause. Equifax? Trans Union? Certainly both contributed, as the subject credit reports were trimerge reports containing nearly identical derogatory tradelines.   But the burden for proving such injury – at least in the context of a FCRA case – is modest. Circumstantial evidence is sufficient, particularly at this stage, where all inferences are taken in the Plaintiff's light.

Second, Experian ignores the broad range of other economic damages that the Plaintiff is entitled to take to a jury. She has testified that she was taken out of the credit market entirely because of continuing derogatory inaccurate credit reports issued by the Defendants.   She knew she could not

obtain credit and could not stomach the attempt while her reports remained fatally blemished. Defendant understands that this lost credit opportunity is an established measure of FCRA damages.  In fact, Equifax made and lost a challenge to such damage claims:

> Plaintiff asserts she did not apply for additional credit after these denials for fear that her new applications would be denied as well. She also contends her reputation has been damaged as a result of Equifax's actions.  Defendant, in turn, argues Plaintiff was unable to identify any specific lost credit opportunities and, in any event, any purported damage to her reputation is speculative.  The Court disagrees that Plaintiff's fear of lost credit opportunities and/or damage to her reputation is speculative or factually implausible. … Accordingly, the Court denies Defendant's Motion for Partial Summary Judgment on this ground as well.

*Miller v. Equifax Info. Servs., LLC*, 3-11-CV-01231-BR, 2012 WL 5984656 (D. Or. Nov. 28, 2012). Coupled with the details stated in his unobjected credit reports, Ms. Thach's own testimony is more than sufficient to prove his credit damage.  *See e.g. Bach v. First Union Nat. Bank*, 149 F. Appx. 354, 361 (6th Cir. 2005) (permitting proof of credit denial by consumer's own testimony); *Adams v. Phillips*, No. 01-3803, 2002 WL 31886737, at *2-3 (E.D. La. Dec. 19, 2002) (same); *Drew v. Equifax Info. Servs., LLC*, No. C 07-00726 SI, 2010 WL 5022466 (N.D. Cal. Dec. 3, 2010) (rejecting challenge to proof of damages by Plaintiff's own testimony based on defense argument that "the only evidence that could possibly support an award are tri-merge documents, which are hearsay and cannot be used to prove the contents of plaintiff's Equifax file.")

Further, though modest, the damage a consumer incurs in trying to obtain correction of her credit report is fully compensable under the FCRA. *Robinson v. Equifax Info. Servs, LLC*, 560 F.3d 235, 246 (4th Cir. 2009) ("Based on our review of the record, we also conclude that Robinson proffered sufficient evidence of loss of income from time missed from work addressing Equifax's errors."); *Dixon-Rollins v. Experian Info. Solutions, Inc.*, No. 09-0646, 2010 WL 4939441 (E.D. Pa. Sept. 23, 2010) ("At the very least, she is entitled to damages suffered in connection with her efforts to correct the error in Trans Union's credit report.); *see Cortez,* 617 F.3d at 717("Time spent trying to resolve problems with the credit reporting agency may also be taken into account."). Ms. Thach has testified to such a loss.

**Non-economic injury**.  Experian does not deny the existence of the Plaintiff's emotional

distress, reputational injury, embarrassment and fear at loss of her credit. However, it claims that a FCRA plaintiff must also satisfy the taller thresholds it interprets from the Fourth Circuit's non-FCRA case, *Doe v. Chao*. 306 F.3d 170 (4th Circ. 2002). However, Plaintiff is unaware of a single instance in which the Fourth Circuit or any court has applied Doe to the FCRA. In fact, the Fourth Circuit and this District have done just the opposite, following the line of cases permitting a consumer to recover for non-economic injury even without proof of physical manifestation, medical evidence or expert collaboration.

Ms. Thach's actual damages may properly include his frustration, embarrassment, and other emotional and mental distress. Often, as in this case, "[T]he most significant damage sustained by a consumer is the emotional distress and vexation of dealing with the repercussions of an inaccurate credit report and the often frustrating ordeal of trying to set the record straight." *Fair Credit Reporting*, Fifth Ed., NCLC, §11.2.3.1, p. 273 (2002). Damages are available under the FCRA for loss of sleep, nervousness, frustration and mental anguish over the consumer report; injury to reputation, family, work and sense of well-being; and humiliation, embarrassment, and mental distress. In *Dalton*, the Fourth Circuit considered a case in which an employment consumer report had been inaccurate even after the consumer's dispute. The district court had granted summary judgment. Both parties had stipulated that Dalton's application would not have been approved for reasons entirely unrelated to the inaccurate consumer report. The CRA argued that the failure to prove an actual denial of the application (in that case for employment; in this case for credit) meant that the consumer had not suffered cognizable damages. The Fourth Circuit rejected this argument, stating:

> Even though CAI's false report is not what prevented Dalton from getting a job with Sumitomo, we are hesitant to say that the district court necessarily would have concluded that Dalton could not show that CAI caused him any damages on his FCRA claims. … On his FCRA claims Dalton need only show that he suffered damages from the false report, regardless of how Sumitomo reacted to the report. Specifically, Dalton alleges that he suffered emotional distress and loss of reputation as a result of the false report. Damages for such injuries are recoverable under FCRA.

*Dalton*, 257 F.3d at 418-19. Similarly, the Fourth Circuit accepted comparable evidence of emotional

distress in *Sloane v. Equifax Info. Servs.,* 510 F.3d 495, 503–07 (4th Cir.2007).   And this Court has rejected Experian's identical argument when it made in *Burke*. 2011 WL 1085874 (E.D. Va. Mar. 18, 2011).

## V.     A REASONABLE JURY COULD FIND THAT EXPERIAN WAS WILLFUL.

Experian also makes a half-hearted challenge to Plaintiff's willfulness allegation, asserting that, "There is, in fact, no evidence that Experian failed to do anything the law requires[.]"  (Dkt. No. 112, at 18.)  But in fact, as the numerous decisions already considered in passim evidence, Experian knows that its automated procedures and broad matching failures violate the FCRA, and certainly that they posed unacceptable risk to consumers such as Ms. Thach.  There is more than sufficient evidence and basis to deny summary judgment.

 Despite the Fourth Circuit's admonition in *Dalton* that "summary judgment is 'seldom appropriate' on whether a party possessed a particular state of mind," *Dalton,* 257 F.3d at 418, Experian still asks the Court to take from the jury the question of whether its conduct and policies were willful.[8] The Court should decline this invitation to narrowly and unreasonably constrain the FCRA.

Under the FCRA, a person who "negligently" violates its provisions is liable for actual damages under 15 U.S.C. §1681o.  If a jury finds that the violations were "willful", then the defendant can be liable for punitive damages under 15 U.S.C. §1681n.  Unlike Virginia's common law torts, "A showing of malice or evil motive is not required to prove willfulness under the Act." *Dalton,* 257 F.3d at 418.   A defendant may "willfully violate the FCRA by adopting a policy with reckless disregard of whether it contravenes a plaintiff's rights under the FCRA."   *Cortez v. Trans Union, LLC*, 617 F.3d 688, 721-22 (3d Cir. 2010) (citing *Safeco Ins. Co. of America v. Burr,* 127 S.Ct. 2201 (2007)). Even a single FCRA

---

[8] Willfulness is nearly always a question of fact for the jury.  *Lenox v. Equifax Info. Servs. LLC,* 2007 WL 1406914, at *6 (D. Or. May 7, 2007)(reasoning "whether defendant's action or inaction rises to the level of willfulness so as to violate the statutory obligations of the FCRA is also a question of fact"); *Guimond v. Trans Union Credit Info. Co.,* 45 F.3d 1329, 1333 (9th Cir.1995)(recognizing "The reasonableness of the procedures and whether the agency followed them will be jury questions in the overwhelming majority of cases."); *Cahlin v. Gen'l Motors Acceptance Corp.,* 936 F.2d 1151, 1156 (11th Cir.1991); *Centuouri v. Experian Info. Solutions, Inc.,* 431 F.Supp.2d 1002, 1007 (D.Ariz.2006)(refusing to grant summary judgment on the issue of willfulness in a case involving the reasonableness of consumer protection procedures); *Holmes v. Telecheck Int'l, Inc.,* 556 F. Supp. 2d 819, 847 (M.D. Tenn. 2008).

dispute can support a willfulness verdict.  *Saunders v. Branch Banking And Trust Co. Of VA*, 526 F.3d 142, 151 (4th Cir. 2008).

The Court need not look far to find comparable legal authority to deny this motion.  In *Mullins v. Equifax Info. Servs., LLC*, Judge Payne entered a jury verdict based on far weaker facts than in this case, based upon the CRA's established ACDV alternative to a real investigation, and the fact that the defendant had substantial notice that these procedures violated the FCRA.  The Court explained:

> Viewed as a whole, the record here supports a finding of willfulness under either standard. The plaintiff presented evidence from which the jury reasonably found TU deliberately and consciously committed the violations of the FCRA found by the jury. Certainly, the evidence supports a finding under the rule of *Safeco*. Indeed, from the record, the jury reasonably could have inferred that TU has chosen to disobey the FCRA's reinvestigation and related provisions because it is less expensive to do so, even if it loses a few cases, than it is to comply with the statute.

*Mullins v. Equifax Info. Servs., LLC*, CIV. 3:05CV888, 2007 WL 2471080 (E.D. Va. Aug. 27, 2007).

As offered above, Experian has received substantial judicial criticism and notice of its non-compliance, including sue sponte grant of summary judgment against it in the Ninth Circuit – its home circuit. In fact, the United States District Court for the Southern District of New York found,

> Given the evidence regarding the accuracy of Experian's report and the reasonableness of their procedures … a jury could find that Experian showed a reckless disregard for the requirements of sections 1681e(b) and 1681i. Here, in addition to Experian's admission that it failed to conduct any independent investigation of the validity of Plaintiff's Deed in Lieu of Foreclosure, Experian failed to consider an E-OSCAR notification from HSBC that contained updated information regarding the Mortgage Loan.

*Gorman v. Experian Info. Solutions, Inc.*, 07 CV 1846 (RPP), 2008 WL 4934047 (S.D.N.Y. Nov. 19, 2008).  This case is no different.  Summary judgment is not proper.

## CONCLUSION

For the reasons stated herein, the Plaintiff, Thanh Thach, respectfully requests the Court to deny Experian's Motion for Summary Judgment.

Respectfully Submitted,
**THANH THACH**
By:_____/s/_____
Kristi Cahoon Kelly, VSB #72791

31

Andrew J. Guzzo, VSB #82170
KELLY & CRANDALL, PLC
4084 University Drive, Suite 202A
Fairfax, VA  22030
(703) 424-7570 – Telephone
(703) 591-0167 – Facsimile
E-mail:  kkelly@kellyandcrandall.com
E-mail:  aguzzo@kellyandcrandall.com

Leonard A. Bennett, VSB # 37523
Susan Rotkis, Esq., VSB #40693
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd. 1A
Newport News, Virginia 23601
Telephone:  (757) 930-3660
Facsimile:  (757) 930-3662
Email: lenbennett@clalegal.com
Email: srotkis@clalegal.com
*Counsel for Plaintiff*

**Certificate of Service**

I certify that on the 22nd day of September, 2014, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

John Willard Montgomery, Jr.
Montgomery & Simpson, LLLP
2116 Dabney Rd., Suite A-1
Richmond, VA 23230
Telephone: (804) 355-8744
Email: jmontgomery@jwm-law.com
*Counsel for Equifax Information Services*

Joseph W. Clark
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001-2113
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
Email: jwclark@jonesday.com
*Counsel for Experian Information Solutions, Inc.*

Barry Goheen, *Pro Hac Vice*
J. Anthony Love, *Pro Hac Vice*
Ian E. Smith, *Pro Hac Vice*
KING & SPALDING LLP
1180 Peachtree Street NE
Atlanta, Georgia 30309-3531
404-572-4600 - Telephone
404-572-5100 - Facsimile
Email:bgoheen@kslaw.com
Email:tlove@kslaw.com
Email:iesmith@kslaw.com
*Counsel for Equifax Information Servs., LLC*

/s/_____
Kristi C. Kelly, VSB#72791
Kelly & Crandall, PLC
4084 University Drive, Suite 202A
Fairfax, VA 22030
Telephone: 703-424-7572
Fax: 703-591-0167
Email: kkelly@kellyandcrandall.com
*Counsel for Plaintiff*